Frank WATTS, Plaintiff–Applicant,

v.

CIVIL SERVICE BOARD FOR COLUM-
BIA, Defendant–Respondent.

Supreme Court of Tennessee.

Sept. 8, 1980.

Jack B. Henry, Henry & Henry, Pulaski, for plaintiff–applicant.

Courtney, Fleming & Gray, Columbia, for defendant–respondent.

## OPINION

BROOKS McLEMORE, Special Justice.

The Civil Service Board for the City of Columbia found city policeman Frank Watts, the plaintiff–applicant (hereinafter called the plaintiff) guilty of "disobeying a written directive of the Chief of Police and conduct unbecoming an officer, both violations of the Standard Operating Procedure Manual of the Columbia Police Department." The Board's action thus affirmed the action of the City Manager in suspending indefinitely the plaintiff from the Columbia Police Department. At the behest of plaintiff, writ of certiorari was issued by the Circuit Court of Maury County to review the action of the Board. After a hearing, the Circuit Court entered a judgment, containing findings of fact, which sustained the action of the Civil Service Board. Upon appeal, the Court of Appeals affirmed the judgment of the Circuit Court. This court granted plaintiff's application to appeal to review that action.

We have duly considered the facts set forth in the plaintiff's motion under Rule 14 for consideration of post–judgment facts.

The issues stated in the plaintiff's brief before the Court of Appeals and in this court, though not identically worded, may be treated as being the same. When the issues are narrowed, the plaintiff contends that a "heated discussion" with the District Attorney General was nothing more than the exercise of his First Amendment rights of free speech as made applicable to the states and its instrumentalities by the Fourteenth Amendment. Secondly, he contends that no one may prevent him from presenting evidence to a grand jury and that he may not be disciplined for this act even though he failed to follow procedures expressly directed to him by his superiors. Finally, the plaintiff contends that the action of a majority of the Civil Service Board was arbitrary because of bias or prejudgment. The Board's position is that the plaintiff was terminated simply and solely because of his lack of cooperation with his superiors by disregarding the proper procedures of the police department when given direct orders and for conduct unbecoming an officer in an oral confrontation with the District Attorney General.

The facts which the Civil Service Board heard and the Circuit Court reviewed were fully set forth in the record certified to the Circuit Court. In addition to the evidence heard before the Civil Service Board, the Circuit Court alone heard evidence with respect to whether or not the Board acted illegally, arbitrarily or capriciously toward the plaintiff.

The parties concede, and we hold, that the scope of court review of the action by the Civil Service Board is that afforded by the common law writ of certiorari. T.C.A. § 27 914.

The scope of this review is properly set forth in the Court of Appeals' opinion as follows:

> "In such actions the reviewing court is limited to inquiry as to whether the administrative agency acted fraudulently, illegally or arbitrarily. *Hoover Motor Express Company v. Railroad and Public Utilities Commission*, 195 Tenn. 593, 261 S.W.2d 233 (1953).
>
> *   *   *   *   *   *
>
> Under the common law writ of certiorari, questions of law only will be reviewed by the courts. An action of an administrative agency which is not supported by any

evidence is arbitrary and void and may be quashed on common law writ of certiorari. Whether or not there is any material evidence to support the action of the agency is a question of law to be decided by the reviewing court upon an examination of the evidence introduced before the agency. Any additional evidence offered to the reviewing court is limited to the question of whether the agency exceeded its jurisdiction or acted fraudulently, illegally or arbitrarily. *Hoover Motor Express Co., Inc. v. Railroad & Public Utilities Commission*, 195 Tenn. 593, 261 S.W.2d 233 (1953). *People's Bank of Van Leer v. Bryan*, 55 Tenn.App. 166, 397 S.W.2d 400 [401]; *Bayside Warehouse Co. v. Memphis*, 63 Tenn.App. 268, 470 S.W.2d 375; *Brown v. Tenn. Real Estate Comm.*, Tenn.App. 1972, 494 S.W.2d 506, cert. den. 414 U.S. 877, 94 S.Ct. 54, 38 L.Ed.2d 122."

■ In the trial court, under the common law writ, reversal or modification of the action of the Civil Service Board may be had only when the trial court finds that the Board has acted in violation of constitutional or statutory provisions or in excess of its own statutory authority; has followed unlawful procedure or been guilty of arbitrary or capricious action; or has acted without material evidence to support its decision. The trial court does not weigh the evidence. The scope of review by the appellate courts is no broader or more comprehensive than that of the trial court with respect to evidence presented before the Board.

The trial court and the Court of Appeals both were of the opinion that there was material evidence to support the action of the Board. The trial court found that the Board did not act illegally, arbitrarily or capriciously and the Court of Appeals found that the evidence did not preponderate otherwise.

We affirm the judgment of the Court of Appeals.

■ The plaintiff, a patrolman with twelve years' experience, was requested by one Monty Luna in the latter part of 1975 to find out what had happened to his Luger hand gun that had been confiscated as stolen property by Officers Allen and Duncan of the Columbia Police Department. The plaintiff took this complaint in his capacity as an officer. Luna later testified that this hand gun had been purchased by him from Ernie Anglin for two hundred and fifty dollars. The plaintiff made an investigation and, subsequently, orally reported to the Chief of Police at his home on December 31, 1975. The Chief of Police then made an investigation which included an internal investigation of procedures followed by another officer with respect to possession of the hand gun. Neither an official file nor a report of the results of the investigation was ever made by the plaintiff about his investigation for the records of the Columbia Police Department.

On June 4, 1976, the plaintiff, apparently without the knowledge of his superiors in the police department, testified before the Grand Jury of Maury County in his capacity as a police officer [1] and gave testimony concerning Ernie Anglin. The grand jury returned an indictment against Anglin for the offense of concealing stolen property.

When the accused appeared for trial in January, 1977, the Assistant District Attorney General was of the opinion that the indictment was defective; and he was permitted to enter a *nolle prosequi* with the stated intention of seeking another indictment against the accused.

Later, the plaintiff learned through rumor or "the grapevine" that the District Attorney General was not going to seek indictment. On February 10, 1977, the plaintiff made an appointment with the District Attorney General for the circuit at

1. The plaintiff testified that he signed up for and was paid Court pay for time spent going before the grand jury, and also for trial on January 17, 1977. The plaintiff testified, "Well I'm a police officer twenty–four hours a day according to the charter and everything, so anything I do would have to be as a police officer technically. The second time I went I didn't claim it." "Well, the capacity you always go in, you go as a person but your occupation as a policeman."

his office in Lawrenceburg, Tennessee, where a "heated discussion" occurred when the District Attorney General advised the plaintiff, after stating his reasons, that he did not intend to re–submit the Anglin case to the Grand Jury. It is an undisputed fact that the speech in question was uttered completely within the context of plaintiff's employment relationship. The testimony, in part, of General Gay is as follows:

"Q. When Mr. Watts came to your office on the 10th of February, I believe you stated that as he, well he had left, he raised his voice. Was he hollering at you or what?

A. Yes, sir, he raised his voice and could be heard well down on the street. And I, of course, in the first I couldn't appreciate it because the dialogue that we had and as a result of him raising his voice perhaps I raised my voice when I asked him, 'not to shout at me or to raise his voice toward me.' Yes, sir, this occurred in my office."

\* \* \* \* \* \*

"Q. Now, Mr. Gay, you said you could hear Mr. Watts' voice well down on the street?

A. Oh, I'm sure you could, yes, sir.

Q. And as he left your office, would you state again to the Board what he said to you—

A. He threatened, he threatened in the first place, 'there is going to be further investigation.' He said, first, 'no two--bit politician is going to tell him what to do.' And then he said, 'there'll be a further investigation on this and you may be involved too.' This was as he went down my stairs. My office is on the second floor and I couldn't appreciate a threat . . . ."

\* \* \* \* \* \*

"Q. And it was after all of this that he raised his voice where he could be heard down on the street and said you were a two–bit politician? And —

A. Well I don't know, I'm not going to accuse Mr. Watts of saying that I was. The only thing he made reference to is,

'that no two–bit politician was going to tell him.' And then of course when he left and talked about investigations I considered it a threat, and that's the reason that I came and reported the incident to Chief Holton who in turn, by the way, called Mr. Barrett Jones into the office while I was making the statement."

\* \* \* \* \* \*

"Q. Were you offended by the statements that he made?

A. Yes I was. I would not have reported it if I had not been. Yes, sir."

\* \* \* \* \* \*

"MR. RALPH: He didn't use any profane or ·

THE WITNESS: No, sir, I couldn't say that Officer Watts used any profanity."

Plaintiff's account contained the following testimony:

"Q. And this was a very heated discussion between the two of you?

A. Yes, sir, very heated.

Q. And his statement that it could be heard all the way down on the street I assume that's probably right, then, if you're talking pretty loud --

A. I wouldn't doubt if they didn't hear it at the Courthouse.

Q. And you don't deny that you shouted at him?

A. And he shouted at me, yes, sir."

On February 21, 1977, plaintiff received a letter from the Chief of Police, approved by the City Manager, stating:

"Dear Officer Watts:

On February 16, 1977 this office was advised by District Attorney General Bob Gay that you presented a case against a Mr. Ernie Anglin, and it was dismissed in Circuit Court by Judge Sam Lewis on January 17, 1977. General Gay stated that you consulted with him at his Lawrenceburg office on February 10, 1977 at 8:45 a. m. at which time General Gay informed you that this case would not be represented to the Maury County Grand Jury due to an inadequate case.

I was further advised that your attitude in his office on this matter was conduct

unbecoming an officer. It was also mentioned that you attempted to pursue this matter as a civilian, which you cannot do, based on the facts you have already testified to information you obtained as a police officer.

You appeared before the Grand Jury and prosecuted this case in January, 1977 representing yourself as a Columbia Police officer. You were not under any direction or supervision to act as a police officer representing the Columbia Police Department in this case. This is to advise you that you shall not proceed with any evidence to the next Grand Jury or any other court, news media, or any other persons concerning this case unless you have prior clearance from either me or the City Manager. Your conduct representing yourself to the Grand Jury as an authorized representative of the Columbia Police Department is subject to further review.

You have been given previous reprimands regarding policies and procedures of this department without going through the official channels. Your conduct and investigation into this matter without approval of the proper authorities is in defiance of previous reprimands, and you will be notified of the specific disciplinary measures to be taken."

Shortly thereafter, the plaintiff showed the letter to two members of the judiciary. One of these judges told the plaintiff that no one could prevent an individual from going before the grand jury and that he considered the order not to go before the grand jury an illegal order. One of the judges told him that every man, no matter what his job has a duty and obligation to appear before the grand jury and present evidence that he has regarding any crime. The plaintiff testified that he relied on the conversations with the two judges.

Both judges testified at the hearing before the Board. We gather from their testimony that the judges only knew what the letter of February 21 stated and did not know all the facts in the case. Certainly at that time they did not know the contents of the letter from the Chief of Police dated March 10. Both recognized that the Police Department must have rules and regulations conditioned, of course, that they be lawful rules and regulations.

The plaintiff testified before the Board that no one complained about his going before the grand jury in the Anglin matter on June 4, 1976, until after he had had his "heated" conversation on February 10, 1977, with the District Attorney General who complained to the Chief of Police about the plaintiff's conduct and attitude. It was in the letter of February 21, 1977, from the Chief of Police that he first received any orders about going before the grand jury. The plaintiff, having already made up his mind to go before the grand jury if permission were denied him, hand-delivered a letter to the City Manager on March 9, 1977, requesting permission to go before the grand jury. In this letter, the plaintiff stated that he had no new evidence to present to the grand jury other than that presented in June, 1976.

On March 10, 1977, the Chief of Police, in a letter approved by the City Manager, wrote the plaintiff as follows:

"Dear Officer Watts:

This letter is in answer to your request of March 9, 1977 to appear before the Grand Jury on an Ernie Anglin case. You stated in your request that you had no additional information and only wanted to return to the Grand Jury because the previous trial was dismissed due to an error.

It is the opinion of this office that since no record or case number was ever entered into the files with the Columbia Police Department on this case that your request be denied. If this is to be pursued and you would share your information and evidence with our Detective Division which handles our investigative matters on criminal problems, and if upon their investigation with your aid and evidence found probable cause to prosecute this case, this department would certainly grant you permission to do so.

After conferring with the Attorney General, it was his opinion that there was evidence lacking in this case. It was stated in your previous reprimand that you did not have a case against Mr. Ernie Anglin, and therefore, your permission to pursue this case is denied. Your letter of reprimand concerning this matter dated February 21, 1977 still stands."

Thereafter, without further consultation with any city or police official, the plaintiff appeared before the Maury County Grand Jury without being subpoenaed and testified in support of the reindictment of Anglin on the charge of concealing stolen property. At this time, he was asked whether he had discussed the case with city detectives.

The grand jury did not indict Anglin.

On April 21, 1977, Ernie Anglin filed suit for damages in the Circuit Court at Columbia against the plaintiff and the City of Columbia; and he alleged, among other things, that the plaintiff's actions during the May Term of the grand jury "procuring an indictment against the plaintiff for concealing stolen property . . . were carried out . . . maliciously, and without probable cause. . . ."[2]

Subsequently, on April 25, 1977, the plaintiff was suspended indefinitely, as previously stated, for violation of two mandates of the Columbia Police Department Manual, which are as follows:

"All lawful orders of superior officers shall be cheerfully, faithfully and promptly obeyed and enforced without question or argument. If any officer does not clearly understand an order, he shall ask for such information as may be necessary for a clear understanding, but under no circumstances shall he question the authority of a superior officer or engage in any argument concerning the order given."

\*      \*      \*      \*      \*      \*

2. On August 24, 1978, the plaintiff Anglin took a voluntary non–suit "with prejudice" in this suit.

"Members shall at all times be courteous and civil to the public and to one another. They shall be quiet, orderly, attentive and respectful and shall exercise patience and discretion in the performance of their duties. At no time shall they use coarse, profane or insolent language to any citizen, nor shall they speak disparagingly of any nationality, race, creed, religion or political belief."

The City Manager testified as to his reasons for the suspension of the plaintiff:

"Well Mr. Watts had very willfully disobeyed a written order of his superior officer and it appeared to me that he was, just wanted to put the Chief and/or the City to a test as to who is to supervise the Department and that it was a very clear–cut case of whether or not he was going to be subject to any direction by the Department or his employers and he defied the action of the Chief of Police. That was one reason. And then of course his conduct in the office of the Attorney General was another matter and I would certainly feel that any police officer and any city employee, especially any police officer, would have an obligation to conduct themselves in a businesslike manner when talking with any members of the public and certainly with the Attorney General of this District and I felt those were both very serious matters and I felt that he deserved an indefinite suspension for this."

He further testified as to his intentions and the procedures of the police department:

"Q. Did you intend to just flatly deny Mr. Watts the right to ever appear before the Grand Jury regarding this case?
A. I think we made it very clear to Mr. Watts that all we were asking is that he follow procedures of the Department in pursuing this or any other case, that there should be a file established on the Department, and it should go through the Department investigative division.

Q. Is there any way to your knowledge for the Columbia Police Department to determine what their officers are doing without following this procedure?

A. I wouldn't be aware of any way you could.

Q. Did Officer Watts subsequent to the time that you wrote this letter, did he ever at that time turn over any evidence or work in conjunction with the Department, the Detective Department as instructed.in that letter?

A. No.

Q. To your knowledge on today's date, has the City of Columbia got any file on this particular case?

A. Not to my knowledge."

The foregoing evidence constitutes material evidence to support the finding of the Civil Service Board. With such evidence, the matter is foreclosed unless the Board has acted fraudulently, illegally or arbitrarily.

We now turn to that aspect of the case.

As to the issue of illegality, counsel for plaintiff argues that two important constitutional questions are presented: one federal and one state. Counsel for the Board argues that if the proper officials of a police department cannot require subordinates to follow reasonable rules and procedures, then chaos will result. Counsel have cited no Tennessee case in point, and our research has revealed none.

■ Certainly, we agree that acts of a police officer that are afforded constitutional protection cannot be the basis of loss of employment where that employment is protected by a civil service system. Indeed, it has been held that government employees who are not protected by contractual or tenure "rights" may not be dismissed for engaging in constitutionally protected speech. *Perry v. Sindermann,* 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972).

■ Furthermore, we recognize that, "[P]olicemen ... are not relegated to a watered–down version of constitutional rights." *Garrity v. New Jersey,* 385 U.S. 493, 500, 87 S.Ct. 616, 17 L.Ed.2d 562 (1967).

A public employee does not forfeit his protection against governmental abridgment of freedom of speech if he expresses his views privately rather than publicly. *Givhan v. Western Line Consolid. Sch. Dist.,* 439 U.S. 410, 99 S.Ct. 693, 58 L.Ed.2d 619 (1979). The court in *Givhan, supra,* stated in a footnote:

"Private expression, however, may in some situations bring additional factors to the *Pickering [infra]* calculus. When a government employee personally confronts his immediate superior, the employing agency's institutional efficiency may be threatened not only by the content of the employee's message but also by the manner, time, and place in which it is delivered." *Id.,* footnote 4, 99 S.Ct. 696 n.4, 58 L.Ed.2d 619, 624.

Though freedom of speech holds a preferred position in the roll call of constitutional guarantees of individual freedoms, the guarantee is not absolute. Not all restraints on a public employee's speech are prohibited. The rights of the public employee speaker can be balanced against the rights of the governmental employer. *Pickering v. Board of Education,* 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968). In that case, the Supreme Court of the United States said:

"[T]he State has interests as an employer in regulating the speech of its employees that differ significantly from those it possesses in connection with the regulation of the speech of the citizenry in general. The problem in any case is to arrive at a balance between the interest of the [public employee], as a citizen in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Id.,* 391 U.S. at 568, 88 S.Ct. at 1734, 20 L.Ed.2d at 817.

Municipal police forces are a para–military force by virtue of their organized structure, central control, discipline and uniform dress and the fact that they bear arms. A member of this type of organization may, by his speech and conduct, more

readily create problems of maintaining discipline by immediate superiors or disharmony among co—workers and others whose responsibility it is to maintain law and order in society then by persons in other types of government employment. The public expects a higher standard of personal conduct of a police officer than that of an ordinary governmental employee.

A patrolman may speak freely as to content and manner as long as he does not harm or impair the administration of the police department. He may speak as he pleases and level charges at those with whom he and his department must work. But, if the exercise of this privilege disrupts his own work and the proper functioning of the public's business, he is subject to discharge for cause without it being said that he was denied his freedom of speech. *See* 4 McQuillin Mun. Corp. § 12.240 (3rd rev. ed. 1979). Dissent and criticism are not prohibited, but courteous communication with officials who share in his responsibility to enforce laws and with the public in general may be required without violation of First Amendment rights.

This is not a case where the plaintiff has been punished for publicly criticizing the actions of his superiors or policies of the police department, nor is this a case where overbroad or vague department rules are involved. The mandates here involved are reasonable. One is not required to guess what conduct is demanded or what utterances are proscribed.

The District Attorney General is the prosecutor of persons charged with crime in this state; and in such capacity, the officers of a police department must constantly advise and deal with him or his assistants. The evidence regarding the "heated discussion" and confrontation with the District Attorney General, as set forth, *supra*, and other evidence in the record, are sufficient to support the action of the Board in finding that the plaintiff was guilty of

violating the mandate against using insolent (or insulting) [3] language to any citizen, which resulted in conduct unbecoming an officer such as to impair his performance of his duties. The District Attorney General, having complained, is evidence that the plaintiff's work with that official was impaired.

On the question of First Amendment rights, the plaintiff has cited in addition to *Pickering, supra: New York Times Co. v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964); *Garrison v. Louisiana*, 379 U.S. 64, 85 S.Ct. 209, 13 L.Ed.2d 125 (1965); *In Re Hickey*, 149 Tenn. 344, 258 S.W. 417 (1923). We have considered these cases and are not persuaded in the plaintiff's favor by them. In *Pickering*, the fact of employment was only tangentially and insubstantially involved in the public communication. Public statements made by a school teacher were in no way directed towards any person with whom the teacher would normally be in contact in the course of his daily work as a teacher. There was no question of maintaining either discipline by immediate superiors or harmony among co workers as is presented here. There is a difference between the operation of schools and the operations of a disciplined and efficient police department. *Garrison* dealt with a criminal defamation conviction stemming from statements made at a press conference by a district attorney about the judges before whom he regularly appeared. *Hickey* involved contempt of court and disbarment for utterances and written statements made outside the presence of the court. *Times* dealt with a libel suit arising out of an advertisement signed by private citizens, criticizing a public official in his official capacity.

We find no merit to the plaintiff's contention that his First Amendment rights have been violated by the Board.

We agree with the statement that no one may prevent a person from appearing before a grand jury. Indeed, it is his

**3.** There is some confusion as to which was the correct word. The result would be the same with either word.

duty to do so if he has evidence of a crime. The District Attorney may ask for an indictment, or the grand jury may act by presentment.

■ However, we are of the opinion that there is material and substantial evidence that the act of the plaintiff's appearance before the grand jury is not the reason that the plaintiff was suspended indefinitely. We think that there is material, substantial and convincing evidence that the real issue was whether the plaintiff was subject to obedience to orders of his superiors. What was demanded of the plaintiff was that he handle his investigation in accordance with official channels, police policies and procedures and in cooperation with the Detective Division.

The plaintiff, in his actions, was acting in his official capacity as a police officer of the City of Columbia. He drew court pay for his appearance before the Grand Jury on June 4, 1976. Under some circumstances, the City may sustain exposure to liability for unlawful or tortious acts of its employees presumptively acting in the course of their employment. Those in charge of maintaining a competent police force exposed to such liability must keep up with the latest statutes and court decisions and must be continuously vigilant in the fulfillment of their supervisory obligations.

We quote with approval from the opinion of the Court of Appeals in the instant case prepared for that Court by Judge Todd:

"If plaintiff had seen fit to obey instructions by sharing information with designated police officials and if such officials had deemed plaintiff's information to be insufficient for prosecution, then the proper official of the police department would have had the authority to forbid plaintiff to prosecute *in his capacity as a policeman.* In this event, plaintiff would retain his right *as an individual* to appear before the Grand Jury; and the police department would have a right to disavow any authorization for or connection with the prosecution in order to assure that civil liability for the prosecution rested solely upon plaintiff as an individual, and not upon the City for official acts of one of its policemen."

The plaintiff has previously been involved in litigation which ultimately reached this Court in regard to the manner of selection of the Assistant Chief of Police. *Blair v. State ex rel. Watts,* 555 S.W.2d 709 (1977). He testified in the instant case that, "Well, they call me Ralph Nader of the Police department. I just hate to see crooked politics going on." We also think it is significant that communications between a patrolman and the Chief of Police and the City Manager had degenerated to the point that they were in writing. The record does not disclose, insofar as we are able to find, the number of policemen in the Columbia Police Department; however, the Tennessee Blue Book published by the Secretary of State shows the 1974 population of Columbia as being 21,471. It would be surprising in a department of that size if communications in writing between the officers and the Chief were the norm.

■ Obedience to reasonable orders to prepare files for record and consultation with superior officers in a paramilitary organization such as a city police force can be expected. The need for obedience in a police force is not just desirable, but oftentimes compelling. Each citizen cannot be policed by his own private constable. There must be widespread voluntary compliance with the law. Except under the most unusual circumstances, citizens are required to submit to the authority of police officers. It is elementary that if there is to be order in an evergrowing population, then citizens should show a great degree of respect to them. As previously stated in the discussion of First Amendment Rights, to maintain this respect requires a measure of conduct in an officer that is above that expected of government employees in general. Proper respect by subordinates for superior officers is necessary for the maintenance of public confidence. The plaintiff's failure to prepare a file on his investigation and consult with his superiors is conceded. We do not think that the plaintiff's right to appear before a grand jury necessarily insulates

him from discipline as a result of this failure.

The plaintiff testified that he had completed his investigation of the Anglin matter. He had a "heated" confrontation with the District Attorney General who complained to his superiors who wrote the letters previously quoted. He consulted with two judges and testified that he consulted with two lawyers, but he failed or refused to consult with his superiors as directed. When asked, "Why wouldn't you at least pay them the courtesy of giving them the information that you had as you had been instructed by the Chief of Police," he responded: "He said 'to see if I had probable cause.' I didn't need them to see if I had probable cause, the grand jury already told me I had probable cause. Every arrest an officer makes is probable cause and I've been on the force twelve years and I guess I know about as much about probable cause as they do and been to as many schools as they have."

■ The Civil Service Board was entitled to conclude from the evidence before it the following: (1) the officer's conduct was subversive of discipline and constituted a rebellious challenge to the authority of his superior officers; (2) the toleration of such conduct would be disruptive to harmony and efficiency in the police department; and (3) the reason for his suspension was not his appearance before the Grand Jury as an individual, but that such appearance as a police officer was only evidence of his refusal to obey procedures laid down in writing by his superiors.

We conclude, as did the Court of Appeals, that the Board was acting upon substantial evidence and proper, legal and constitutional grounds in finding plaintiff guilty of misconduct meriting discipline.

The plaintiff contended in the trial court that at least one member of the Civil Service Board was biased and had prejudged his case and, since the vote to suspended was three to two and the member alleged to be biased or guilty of prejudgment voted with the prevailing side, the Board had acted illegally or arbitrarily.

The plaintiff in his brief states, "On this issue, the reviewing court weighs the evidence and determines by a preponderance of the proof whether the lower tribunal acted illegally or arbitrarily," citing *Peoples Bank of Van Leer v. Bryan*, 55 Tenn.App. 166, 174, 397 S.W.2d 401, 405 (1965).

■ Non-jury judgments are presumed correct unless the evidence preponderates otherwise. T.C.A. § 27-303.

■ Evidence was presented by both parties on this issue. This evidence included the record of the hearing before the Board and oral testimony of witnesses heard by the trial court. The testimony presented for the first time before the trial court was conflicting and, therefore, involved the credibility of witnesses and the preponderance of the evidence. The trial court, as previously stated, found adversely to the plaintiff. In our review of the case, we have carefully read the record before the Civil Service Board and the additional evidence presented to the trial court. When all evidence and inferences therefrom are considered, we agree, as did the Court of Appeals, that the evidence does not preponderate against the finding of the trial court.

Accordingly, the judgment of the Court of Appeals is affirmed. That is, the action of the Circuit Court in sustaining the action of the Civil Service Board is affirmed; the petition of the plaintiff for certiorari is dismissed; and all costs, including costs in this Court, are taxed against the plaintiff-applicant and his surety.

COOPER and HARBISON, JJ., concur.

BROCK, C. J., and FONES, J., dissent.

BROCK, Chief Justice, dissenting.

I respectfully dissent.

Stripped of the protective verbiage surrounding it, the plain truth is that the plaintiff was fired because he testified before a grand jury in violation of an ultimatum from the Chief of Police that he not do so.

That ultimatum is as follows:

"This is to advise you that you shall not proceed with any evidence to the next Grand Jury or any other court, news media, or any other persons concerning this case unless you have prior clearance from either me or the city manager."[1]

In my view this attempt by the Chief of Police of the City of Columbia to shut the mouth of officer Watts is totally invalid on its face. Such a gross, sweeping attempt to deprive the plaintiff of his right to speak clearly violates his rights under the freedom of speech guaranties of both the State and Federal Constitutions. See the *Perry, Garrity, Pickering* and *Givhan* cases cited in the majority opinion.

This attempted "gag order" is invalid, however, for a different reason, i. e., every citizen has access to testify before the grand jury in this state. Any attempt to cut off that access is against public policy. The grand jury may act by presentment as well as by indictment. It is absolutely intolerable in a free society that any public employee may be forbidden to go before a grand jury and give testimony of facts within his knowledge respecting criminal offenses. Police officers sometimes become aware of criminal offenses committed by other police officers or their superiors, or their civilian cronies. When this occurs, is the officer to run the risk of losing his employment if he testified before the grand jury with respect to such offenses in spite of a "gag order" such as the one here? Let us hope not.

I would hold that the "gag order" attempted here was invalid and, thus, that its violation is insufficient ground to discharge officer Watts.

Although it is clear to me that the charge of conduct unbecoming an officer was not really the basis, or part of the basis, for plaintiff's discharge, if it were I would hold that there is no material evidence upon which to make this finding here. The conversation between the plaintiff and the District Attorney General was private. Moreover, there was provocation for such display of temper on the part of officer Watts as occurred.

I would reverse.

FONES, J., joins in this dissent.

---

1. Letter from Chief of Police to plaintiff received February 21, 1977.