IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
Assigned On Brief November 29, 2006

## CHARLES JACKSON v. SHELBY COUNTY CIVIL SERVICE MERIT BOARD, et al.

**Direct Appeal from the Chancery Court for Shelby County**
**No. CH-03-0159-1     Walter L. Evans, Chancellor**

_____

**No. W2006-01778-COA-R3-CV - Filed January 10, 2007**

_____

Petitioner/Appellant appeals the trial court's denial of his appeal under a writ of certiorari arising from the decision of the Shelby County Civil Service Merit Board to terminate his employment with the Criminal Court Clerk's Office.  We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed; and Remanded**

DAVID R. FARMER, J., delivered the opinion of the court, in which W. FRANK CRAWFORD, P.J., W.S., and HOLLY M. KIRBY, J., joined.

Darrell J. O'Neal, Memphis, Tennessee, for the appellant, Charles Jackson.

Martin W. Zummach, Assistant Shelby County Attorney, for the appellee, Shelby County Government Civil Service Merit Review Board.

**OPINION**

This appeal arises from an order of the Chancery Court for Shelby County denying Petitioner Charles Jackson's (Mr. Jackson's) petition for writ of certiorari seeking to overturn the decision of the Shelby County Civil Service Merit Board ("the Board") to terminate Mr. Jackson's employment. We affirm.

The facts relevant to our review are undisputed.  Mr. Jackson was employed as a clerk in the Shelby County Criminal Court Clerk's Office ("Clerk's Office") during the campaign period preceding the July 30, 2002 elections.  The Criminal Court Clerk, an elected official, was William Key (Mr. Key).  Mr. Key was re-elected on July 30, 2002.  During the campaign period, Mr. Jackson distributed signs reading: Just Say "No" to Bill KKKey Criminal Court Clerk."  The "K's" on the sign were printed in red.  The signs also included an illustration or sketch of a hooded Ku Klux Klansman.  Mr. Jackson also made statements to the press confirming that he "paid for" the signs and "put them out."  He further stated that Mr. Key had "demonstrated racism, sexism, and bigotry"

and that he was "getting all these threats from him talking about what he's gonna do." Mr. Jackson also stated that he did not think Mr. Key was in the Ku Klux Klan ("KKK" or "the Klan") but that he used the hooded figure to suggest racism. In a letter dated July 31, 2002, William L. Gibbons, District Attorney General, (Mr. Gibbons) informed Mr. Jackson that

> [u]nder Tennessee law, it is a crime for a person to publish or distribute, or cause to be published or distributed, any campaign materials in opposition to any candidate if that persons [sic] knows that any statement or other matter contained on the materials [sic] is false.[1]

Mr. Gibbons further advised:

> [u]nless you have reason to believe that Mr. Key is a member of the KKK, the publication and distribution of such materials appear to violate our state criminal law, and any such publication or distribution should cease immediately.

Following Mr. Key's re-election on July 30, on August 14, Ray Turner (Mr. Turner), chief administrative officer, hand-delivered a notice to Mr. Jackson advising him of the possibility of major disciplinary action resulting from his signs and press conference. The letter charged Mr. Jackson with "acts of misconduct, which are job related." As support for this charge, the letter listed Mr. Jackson's calling of a press conference on July 26, 2002, in violation of Directive 1-8 of the Criminal Court's Clerk's Administrative Manual. It further detailed the signs suggesting that Mr. Key was a KKK member and Mr. Jackson's statements at the press conference that Mr. Key was racist and sexist; that he bypassed minorities for promotion; that he terminated the employment of minorities without cause; that he ignored complaints of sexual harassment; and that Mr. Key had threatened Mr. Jackson. The August 14 letter also referenced Mr. Gibbons' letter of July 31.

Following a Loudermill hearing on August 21, 2002, Mr. Jackson was determined to have engaged in "acts of misconduct, which are job related," where he violated Tennessee Code Annotated § 2-19-142, the statutory provision prohibiting publication and distribution of campaign literature against a candidate in an election containing statements which the distributor/publisher knows to be false. On August 23, Mr. Key informed Mr. Jackson in writing that his employment with the Clerk's Office would be terminated as of 4:30 that afternoon. Mr. Jackson appealed to the Board, which held a hearing on November 14, 2002. On December 2, the Board issued its decision upholding the termination of Mr. Jackson's employment for "acts of misconduct, which are job-related." Mr. Jackson appealed to the chancery court under a writ of certiorari. The trial court affirmed the decision of the Board, and Mr. Jackson filed a timely notice of appeal to this Court.

---

[1]Tennessee Code Annotated § 2-19-142 provides:

It is a Class C misdemeanor for any person to publish or distribute or cause to be published or distributed any campaign literature in opposition to any candidate in any election if such person knows that any such statement, charge, allegation, or other matter contained therein with respect to such candidate is false.

### *Issues Presented*

Mr. Jackson presents the following issues for our review:

(1)     Whether the [trial] court erred when it failed to consider whether Shelby County's decision to terminate Mr. Jackson violated his constitutional rights under the first amendment.

(2)     Whether the Civil Service Merit Board's decision to terminate Petitioner's employment was arbitrary and capricious where it was not based on substantial or material evidence.

(3)     Whether the Civil Service Merit Board deprived the Petitioner of his first amendment rights when it punished the petitioner for engaging in constitutionally protected speech.

(4)     Whether the Civil Service Merit Board deprived the Petitioner of due process where it deprived the Petitioner of his employment without giving him advance notice of proscribed conduct.

(5)     Whether the Civil Service Merit Board deprived the Petitioner of freedom of speech where it deprived the Petitioner of his employment on the basis of a statute that was unconstitutionally overbroad.

### *Standard of Review*

This is an appeal from the trial court's judgment under a writ of certiorari. Such a writ is available from administrative decisions where an administrative board or agency is acting in a judicial or quasi-judicial capacity. *Davison v. Carr*, 659 S.W.2d 361, 363 (Tenn.1983). The Tennessee code provides:

> The writ of certiorari may be granted whenever authorized by law, and also in all cases where an inferior tribunal, board, or officer exercising judicial functions has exceeded the jurisdiction conferred, or is acting illegally, when, in the judgment of the court, there is no other plain, speedy, or adequate remedy.

Tenn. Code Ann. § 27-8-101 (2000).  The court's review under such a writ is limited to whether the inferior board or tribunal exceeded its jurisdiction or acted illegally, arbitrarily, or fraudulently. *McCallen v. City of Memphis*, 786 S.W.2d 633, 640 (Tenn.1990).  The reviewing court does not re-weigh the evidence, but must uphold the board's decision if the board acted within its jurisdiction and did not act illegally, arbitrarily, or fraudulently.  A board's determination is arbitrary and void if it is unsupported by any material evidence. *Watts v. Civil Serv. Bd. of Columbia*, 606 S.W.2d 274, 276-77 (Tenn. 1980).  Whether material evidence supports the board's decision is a question of law

to be decided by the reviewing court based on the evidence submitted to the board. *Id.* at 277. Our review of the trial court's conclusions on matters of law is *de novo* with no presumption of correctness. *Bowden v. Ward*, 27 S.W.3d 913, 916 (Tenn. 2000); Tenn. R. App. P. 13(d). However, this Court's scope of review of the board's determination "is no broader or more comprehensive than that of the trial court with respect to evidence presented before the [b]oard." *Watts*, 606 S.W.2d at 277.

### *Analysis*

We begin our analysis by noting that Mr. Jackson predicates much of his argument to this Court on the assertion that he was fired as a result of expressing his personal opinions about Mr. Key. We disagree with this characterization of the Board's determination. Additionally, although we are inclined to agree with Mr. Jackson that the press conference he held on July 26 was not the type of press conference prohibited by Directive 1-8 of the Criminal Court's Clerk's Administrative Manual,[2] we disagree with Mr. Jackson's assertion that he was finally terminated for violating this directive. The record reflects that Mr. Jackson's employment with the Clerk's Office was terminated because, in violation of Tennessee Code Annotated § 2-19-142, he created and distributed political signs during the July 2002 election that clearly indicated or suggested that Mr. Key was a member of or linked to the KKK while knowing this to be false. As Mr. Jackson acknowledges in his brief to this Court, the Board found:

> On July 26, 2002, the Petitioner called a television press conference to take responsibility for putting up signs linking Bill Key, Criminal Court Clerk, with the Ku Klux Klan during the election campaign (County General Election 2002).
>
> In the press conference, the Petitioner stated that he did not believe that Mr. Bill Key was a member of the KKK, but he was trying to make the point that he believed Mr. Key was a racist, sexist and bigot. He accused Mr. Key of by-passing minorities for promotion, firing African Americans without cause, turning a deaf ear to complaints of sexual harassment and threatening him.

Moreover, Mr. Jackson does not deny having printed or distributed these signs or that he knew Mr. Key was not involved with the KKK. His statements at the July 26 press conference evidence both. Additionally, Mr. Jackson's assertion that the signs were not "campaign literature" as defined by the statute but "protests" is somewhat disingenuous. The signs were published and distributed during the course of an election and "protested" only the re-election of Mr. Key.

We next turn to Mr. Jackson's assertion that Tennessee Code Annotated § 2-19-142 is unconstitutionally overbroad. The record does not reflect that Mr. Jackson provided the Attorney General with notice of the challenge to the constitutionality of § 2-19-142 as required by Tennessee

---

[2]Directive 1-8 prohibits employees from providing information to the media regarding matters related to criminal cases and provides that any publication of such information is at the direction of the court clerk.

Rule of Civil Procedure 24.04 and Tennessee Code Annotated § 29-14-107. The failure to provide notice of a constitutional challenge to the Attorney General as mandated by Tennessee Code Annotated § 29-14-107 and Tennessee Rule of Civil Procedure 24.04 is fatal "except to the extent the challenged statutes are so clearly or blatantly unconstitutional as to obviate the necessity for any discussion." *In re Adoption of E.N.R.*, 42 S.W.3d 26, 28 (Tenn. 2001). Section 2-19-142 is not blatantly unconstitutionally overbroad. Therefore, we consider this issue waived.

We next turn to Mr. Jackson's assertions that the trial court erred by failing to consider whether Shelby County's decision to terminate Mr. Jackson violated his constitutional rights under the first amendment and that the Board deprived him of his first amendment rights when it terminated him for engaging in constitutionally protected speech. Mr. Jackson's argument with respect to these issues, as we perceive it, is that he was terminated for expressing his opinions about Mr. Key. As noted above, the record reflects that the basis for the Board's decision was Mr. Jackson's violation of § 2-19-142. These issues are without merit.

Mr. Jackson's assertion that the Board's decision to terminate his employment was arbitrary and capricious where it was not based on substantial or material evidence is likewise without merit. The Board's decision was based on Mr. Jackson's admitted statements that he developed, created, and distributed the signs although he did not believe Mr. Key was a member of the KKK. Although Mr. Jackson asserts he did not intend to convey the message that Mr. Key was a member of or involved with the KKK, the copy of the sign contained in the record belies this assertion. The sign not only utilizes the letters "KKKey," but includes an image of a hooded Klan member.

We turn finally to Mr. Jackson's assertion that the Board deprived him of due process where it terminated him without "advance notice of proscribed conduct." Mr. Jackson asserts that although the Shelby County Handbook prohibits "acts of misconduct while on duty or in uniform," the handbook does not include a category for "acts of misconduct which are job related." He submits that this category was "specifically created, fabricated and applied to Mr. Jackson because there was no evidence whatsoever that he had engaged in any misconduct while he was on duty or in uniform or that ran afoul of any other item in the Clerk's Office Handbook." He also submits that any publicity he generated with respect to his personal opinions about Mr. Key "did not represent his job as a deputy criminal court clerk or the office of the criminal court clerk." The Board, on the other hand, asserts that although Mr. Jackson may not have put out the signs while on duty, they were in public view twenty-four hours a day and Mr. Jackson was known to be an employee of the Clerk's Office. The Board further asserts, and the trial court observed, that Mr. Jackson's actions negatively impacted the Clerk's Office and its employees.

Having viewed the video-tape contained in the record of a news broadcast of Mr. Jackson's press conference, we disagree with Mr. Jackson's characterization of his activity. Mr. Jackson held his media interview directly outside the Shelby County Criminal Justice Center, which is visible on the tape, and wore his employee ID badge during the interview. He made it known that he was an employee of Mr. Key, and charged that Mr. Key was a racist. As he asserts to this Court, Mr. Jackson stated that he used the KKK imagery to convey that Mr. Key was a racist and that he did not

believe Mr. Key was actually a KKK member. However, Mr. Key also stated that he intended to continue to distribute the suggestive signs after it was clearly evident that they implied KKK affiliation.

It is clear to this Court that, whatever Mr. Jackson intended by using the KKK letters and hooded Klansman image, he knew that the signs implied KKK affiliation and that Mr. Key was not, in fact, a KKK member. It is also clear that the signs were intended to discourage voters from re-electing Mr. Key, and that they were, therefore, campaign-related literature published and distributed in violation of Tennessee Code Annotated § 2-19-142. Moreover, we agree with the trial court that Mr. Jackson's signs undoubtedly negatively impacted the work environment in the Clerk's Office.

Neither the Shelby County Handbook nor the Criminal Court's Clerk's Administrative Manual are included in the record. However, having reviewed the minutes of Mr. Jackson's Lourdermill Hearing, his response to the charges, the video-tape of Mr. Jackson's press interview, the findings of the Board, the transcript of the proceedings before the trial court, and the signs that precipitated this matter, we agree with the trial court that the Board did not abuse its discretion in affirming the termination of Mr. Jackson's employment where it acted neither arbitrarily, fraudulently nor illegally.

### *Holding*

In light of the foregoing, we affirm the judgment of the trial court. Costs of this appeal are taxed to the Appellant, Charles Jackson, and his surety, for which execution may issue if necessary.

_____
DAVID R. FARMER, JUDGE