FILED
05/27/2022
Clerk of the
Appellate Courts

IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
March 2, 2022 Session

## JEFF LUNN ET AL. v. DICKSON COUNTY, TENNESSEE, ET AL.

Appeal from the Chancery Court for Dickson County
No. 2020-CV-287     Laurence M. McMillan, Jr., Chancellor

No. M2021-00543-COA-R3-CV

In this certiorari review of the decision of a board of zoning appeals upholding the zoning director's interpretation and application of the zoning resolutions to permit the building of a fuel terminal, the appellants challenge the decision as being arbitrary and unsupported by the evidence. The trial court concluded that ample material evidence existed to support the decision of the director. Upon our de novo review, we agree and accordingly affirm the decision of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed**

ANDY D. BENNETT, J., delivered the opinion of the Court, in which FRANK G. CLEMENT, JR., P.J., M.S., and W. NEAL MCBRAYER, J., joined.

Rodger Dale Waynick, Jr., Dickson, Tennessee, for the appellants, Jeff Lunn, Angel Lunn, Cathy Bomar, Timothy Fielder, Carl Grimes, Steve Karich, Ann Karich, John Reuter, Charles W. Spann, and Miranda Williams.

Timothy Valton Potter and Andrew Eldridge Mills, Dickson, Tennessee, for the appellees, Dickson County, Tennessee and Dickson County, Tennessee Regional Board of Zoning Appeals.

Thomas V. White and George Arthur Dean, Nashville, Tennessee, for the appellee, Titan Partners, L.L.C.

### OPINION

In April 2020, Titan Partners, L.L.C. ("Titan Partners") applied to the Dickson County Planning and Zoning Director, David Darnell ("Director Darnell"), to obtain site plan approval for the construction of "Project DV," a "+/-34 Acre Petroleum Products / Bulk Fuel Storage and Distribution Terminal on a +/- 146 Acre parcel of land in southeast

Dickson County, near access to Interstates I-40 and I-840." The property upon which Project DV would be located had been classified as an "M-1 Heavy Industrial District" since 1995, and an underground fuel pipeline carrying petroleum had been installed on the property since 1977.

Article V, Section 5.047.1(A) of the Dickson County Zoning Resolutions describes the M-1 Heavy Industrial District as:

> intended to provide areas in which the principal use of land is for manufacturing, processing, assembling, fabrication of materials, and warehousing or storage. These land uses generally do not depend primarily on frequent personal visits by clients or customers, but generally require good accessibility to major rail, water, or highway transportation routes.

Article V, Section 5.047.1(B) provides a list of 13 different "uses"[1] that are "permitted" in the M-1 Heavy Industrial District, including "[w]arehousing facilities." In other words, a warehousing facility is a use permitted as a matter of right in the M-1 Heavy Industrial District. In contrast, Article V, Section 5.047.1(C) provides a list of 17 uses that "may be permitted as special exceptions after review and approval in accordance with Article VIII, section 8.060." The list of uses permitted as special exceptions include "[p]etroleum refining and related industries."[2]

---

[1] The entire list of "permitted uses" under Article V, Section 5.047.1(B) is as follows:

1. Food and kindred products manufacturing, except meat products.
2. Textile Mill products manufacturing except dyeing and finishing of textiles.
3. Lumber and wood products manufacturing.
4. Furniture and fixtures manufacturing.
5. Stone, clay, and glass products manufacturing.
6. Fabricated metal products manufacturing except ordnance and accessories.
7. Miscellaneous manufacturing including jewelry, silverware and plated ware, musical instruments and parts, toys, amusement and sporting goods manufacturing, pens, pencils, and other office materials, costume jewelry, novelties and miscellaneous notions; tobacco manufacturing; motion picture production.
8. Communication, primary and secondary utilities, excluding airports and solid waste.
9. Office functions only where it is directly related to the industrial establishment in which it is located.
10. Signs and billboards as regulated in Article IV, Section 4.070.
11. All uses permitted in the M-2, Light Industrial District.
12. Breweries and distilleries.
13. Warehousing facilities.

[2] Of note, Article V, Section 5.045(B) of the Dickson County Zoning Resolutions defines the property uses permitted in the "C-1, Rural Center District." In that district, "[w]arehouses or storage facilities" are allowed, "except [for] those facilities [] storing petroleum or other potentially hazardous materials." In comparison, the M-1 Industrial District does not explicitly restrict warehouses from containing petroleum or other hazardous materials.

Director Darnell considered Titan Partners' application and determined that the proposed petroleum terminal should be classified as a "warehousing facility" under Article V, Section 5.047.1(B)(13). Under this interpretation, the terminal would be allowed as a matter of right, and no special exception would be necessary. Several Dickson County residents ("Petitioners") appealed Director Darnell's zoning classification to the Dickson County Board of Zoning Appeals ("BZA"), arguing, among other things, that the activities contemplated at Project DV were "refinery related" and therefore required a special exception under the Dickson County Zoning Resolutions. At a public meeting on July 7, 2020, the BZA held a hearing at which Petitioners submitted evidence, including, documentation from the American Petroleum Institute and the United States Department of Labor, Occupational Safety and Health Administration ("OSHA") in support of their arguments. Titan Partners presented affidavits and live testimony in support of its position. By a vote of 3 to 1, the BZA upheld Director Darnell's zoning classification.

On October 27, 2020, Petitioners filed a writ of certiorari seeking judicial review of the BZA's July 7 decision. The trial court found "ample material evidence upon which the [BZA] could conclude that the decision of [the Director] was correct when he determined that the terminal at issue is properly classified as a warehousing facility" and that the "decision of the [BZA] was not arbitrary, capricious or illegal." Petitioners appeal the trial court's finding and articulate their issue as follows: "Did the trial court abuse its discretion by upholding an arbitrary decision by the Board of Zoning classifying the petroleum blending and distribution terminal as a 'warehouse' that is not 'refinery related'?"

STANDARD OF REVIEW

This Court has recently explained that a BZA's decision is reviewed under the common law writ of certiorari standard:

> "The vehicle for reviewing decisions of local boards of zoning appeals is through the common law writ of certiorari. *Hoover, Inc. v. Metro. Bd. of Zoning Appeals of Davidson Cty.*, 955 S.W.2d 52, 54 (Tenn. Ct. App. 1997) (citing *McCallen v. City of Memphis*, 786 S.W.2d 633, 639 (Tenn. 1990)). Under the common law writ of certiorari, the reviewing court must examine whether the municipal agency acted illegally, arbitrarily, fraudulently, or in excess of its jurisdiction. *McCallen*, 786 S.W.2d at 638. In doing so, the court determines "whether there is any material evidence that supports the action of the administrative agency." *Laidlaw Envtl. Servs. of Nashville, Inc. v. Metro. Bd. of Health for Nashville & Davidson Cty.*, 934 S.W.2d 40, 49 (Tenn. Ct. App. 1996) (citing *Lansden v. Tucker*, 321 S.W.2d 795 (Tenn. 1959)). Courts must not "reweigh the evidence" or "scrutinize the intrinsic correctness of the decision," but independently review the record to "determine whether it contains 'such relevant evidence that a reasonable mind might accept as adequate to support a rational conclusion.'" *Lafferty v.*

- 3 -

*City of Winchester*, 46 S.W.3d 752, 759 [(Tenn. Ct. App. 2000)] (quoting *Hedgepath v. Norton*, 839 S.W.2d 416, 421 (Tenn. Ct. App. 1992)). A challenge to the evidentiary foundation for a local zoning decision presents a question of law, which we review *de novo* with no presumption of correctness. *Id.* at 759. This Court's review of the evidence on appeal is no broader or more comprehensive than the trial court's review. *Watts v. Civil Serv. Bd. for Columbia*, 606 S.W.2d 274, 277 (Tenn. 1980)."

*Venture Holdings, LLC v. Metro. Gov't of Nashville & Davidson Cty.*, 585 S.W.3d 409, 416-17 (Tenn. Ct. App. 2019); see also *Northshore Corridor Ass'n v. Knox Cty.*, 633 S.W.3d 561, 569 (Tenn. Ct. App. 2021). Importantly, "[j]udicial review under the common law writ does not involve judicial review of the correctness of the lower tribunal's decision." *Brunetti v. Bd. of Zoning Appeals of Williamson Cty.*, No. 01A01-9803-CV-00120, 1999 WL 802725, at *4 (Tenn. Ct. App. Oct. 7, 1999) (citing *Powell v. Parole Eligibility Rev. Bd.*, 879 S.W.2d 871, 873 (Tenn. Ct. App. 1994)); *see also Capps v. Metro. Gov't of Nashville & Davidson Cty.*, No. M2007-01013-COA-R3-CV, 2008 WL 5427972, at *6 (Tenn. Ct. App. Dec. 31, 2008) (quoting *Lafferty*, 46 S.W.3d at 758) ("'In recognition of the policy that favors permitting the community decisionmakers closest to the events to make the decision, the courts refrain from substituting their judgments for the broad discretionary power of the local governmental body.'").

ANALYSIS

To resolve the issue on appeal, we must determine whether there is relevant evidence that a reasonable mind might accept as adequate to support the BZA's conclusion that Project DV should be classified as a "warehousing facility" under Article V, Section 5.047.1(B) of the Dickson County Zoning Resolutions. This Court has previously examined our role when interpreting and applying a zoning resolution:

The interpretation of a zoning ordinance and its application to a particular set of facts are, in the first instance, questions for decision by local officials. Courts are hesitant to interfere with decisions by local zoning officials unless clearly necessary and will not substitute their judgment for that of the local zoning officials. *See Hoover,* 955 S.W.2d at 54 (citing *McCallen,* 786 S.W.2d at 639); *Whittemore v. Brentwood Planning Comm'n.*, 835 S.W.2d 11, 15 (Tenn. [Ct.] App.1992). However, while courts may defer to local officials' interpretations where the interpretation is fairly debatable and the ordinance is ambiguous, they will set aside an interpretation which is arbitrary and capricious, contrary to the drafters' intent, or which undermines the ordinance's validity. *Whittemore*, 835 S.W.2d at 16.

We interpret these and other relevant authorities to mean that our role is not to provide the initial interpretation of the Ordinance. . . . If the Ordinance

may reasonably be interpreted more than one way, we will not substitute our judgment of the more preferable interpretation as long as the board's choice has a reasoned basis.

*Brunetti*, 1999 WL 802725, at *5. With regard to the quantum of evidence that constitutes "material evidence," our Supreme Court has explained:

> "material evidence" is relevant evidence that a reasonable person would accept as adequate to support a rational conclusion. *Hedgepath v. Norton,* 839 S.W.2d 416, 421 (Tenn. Ct. App. 1992) (quoting *Pace v. Garbage Disposal Dist.*, 390 S.W.2d 461, 463 (Tenn. Ct. App. 1965)). The amount of material evidence required to support an agency's decision "must exceed a scintilla of evidence but may be less than a preponderance of the evidence." *Leonard Plating Co. v. Metropolitan Gov't of Nashville & Davidson Cty.*, 213 S.W.3d 898, 904 (Tenn. Ct. App. 2006).

*Heyne v. Metro. Nashville Bd. of Pub. Educ.*, 380 S.W.3d 715, 738 (Tenn. 2012).

The record shows that Director Darnell consulted the dictionary to assist him in classifying the property and understanding the terms involved. Article II, Section 2.020 of the Dickson County Zoning Resolutions contains a list of defined terms that appear throughout the Resolutions; unfortunately, "warehousing facility" is not listed. However, Article II, Section 2.020 requires that "[t]erms not herein defined shall have their standard dictionary definition or such as the context may imply." As Director Darnell noted, "[w]arehouse" is defined as "a structure or room for the storage of merchandise or commodities." *Warehouse*, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/warehouse (last visited May 4, 2022). A "commodity" is "an economic good, such as . . . an article of commerce especially when delivered for shipment, a mass-produced unspecialized product, [or] something useful or valued." *Commodity*, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/commodity (last visited May 4, 2022). It is axiomatic that petroleum is a commodity.

The evidence presented by Titan Partners at the BZA hearing included the affidavit of Patrick Hurst, a mechanical engineer who had been involved with "the design, inspection, or personal review of approximately 300-350 terminals" like the one at issue in this case. In his affidavit, Mr. Hurst explained:

> 7. The proposed petroleum terminal will not be and should not be confused with an oil refinery, which essentially removes impurities from crude oil in order to produce other petroleum products.
> 8. The terminal proposed at this location will accommodate petroleum products arriving by pipeline and truck, storage on site, and then transporting

by truck to other locations for use. A petroleum terminal such as proposed does not refine and/or manufacture petroleum products.

9. For example, a refined petroleum product, such as gasoline, will be shipped in by pipeline to a distribution terminal. The fuel is initially stored at the terminal in above-ground storage tanks, and then loaded into tank trucks at the terminal's loading rack. The fuel is then delivered to retail gasoline stations, where it is transferred from the trucks to underground storage tanks that feed the pumps that supply gasoline to consumers.

10. It is also perhaps interesting to review the manner in which these 2 uses are regulated under the International Fire Code. The 2012 version of that code, published by the International Code Council, has been adopted by the Tennessee State Department of Commerce and Insurance, Division of Fire Prevention, and applies across the State of Tennessee pursuant to Rule 0780-02-02-.01 and Tenn. Code Ann. § 68-120-101.

11. The IFC clearly distinguishes between refineries and terminals and defines them separately.

12. The IFC defines a refinery as a plant in which flammable or combustible liquids are produced on a commercial scale from crude petroleum, natural gasoline or other hydrocarbon sources.

13. The IFC defines a terminal as that portion of a property where flammable or combustible liquids are received by tank vessel, pipelines, tank car or tank vehicle and are stored or blended in bulk for the purpose of distributing such liquids by tank vessel, pipeline, tank car, tank vehicle, portable tank or container.

14. The proposed terminal in Dickson County will clearly comply with the definition found in the International Fire Code.

. . .

16. Based on the proposed use of the property in Dickson County, my knowledge of petroleum terminals and tank farms, and the definitional classifications found in the International Codes, especially the International Fire Code, it is my opinion that the proposed terminal in Dickson County is a warehousing use within the meaning of that term as used in the Dickson County Zoning Resolution and is certainly not a petroleum refinery. . . .

17. Because such warehousing facilities are expressly permitted in the M-1 Heavy Industrial District, this terminal as proposed is permitted and there is no requirement that special exception be obtained prior to the issuance of the appropriate building and zoning permits.

Titan Partners also submitted the affidavits of: 1) Gianna Aiezza, a licensed engineer, who stated that "[u]nder the EPA fuel regulations, the type of activity which will be conducted at the proposed terminal would not meet the definition of a refinery found at 40 CFR 80.2"; 2) Robert T. Ingalls, the vice president of domestic terminals for Titan Partners, who stated "[w]e will not conduct or permit any refining activities at this facility and have not and will

not register the proposed terminal with the EPA as a refinery"; and 3) Ashley Kerry, a certified public accountant and vice president at Buckeye Partners, L.P., who explained that blending additives into a finished refined petroleum product in connection with "terminalling services" does not equate to "refinery related" activities, but rather meets the definition of "warehousing" for the reasons discussed in Mr. Hurst's affidavit. Finally, Darrell James, a professional engineer in Burns, Tennessee, testified in person regarding the difference between a petroleum terminal and a refinery:

> The petroleum refinery takes crude oil, it separates it into various products. Some of the products, of course, are gasoline and diesel, and those are the end products. The terminal takes those end products through the pipeline, takes it to the terminal, stores it, warehouses it there, and then they fill those trucks that distribute it to the places where we buy gas. Somebody said it's a – it's a gas station of gas stations. And that's exactly what it is, the terminal.

We have examined the administrative record and conclude that the parties presented information and arguments to support their respective points of view, including the Petitioners' arguments that blending chemical additives with the petroleum products constituted "refinery related" activities. The BZA debated and discussed the evidence and merits of the arguments presented by the parties and determined, by a vote of 3 to 1, that Director Darnell was correct in classifying Project DV as a "warehousing facility" under the Dickson County Resolutions. We are directed to give "wide latitude to local officials who are responsible for implementing zoning ordinances" and we must "refrain from substituting [our] judgment[s] for that of the local governmental officials." *State ex rel. Moore & Assocs., Inc. v. West*, 246 S.W.3d 569, 575 (Tenn. Ct. App. 2005). Based on our review of the record, including our review of the evidence outlined above, we find material and relevant evidence exists that a reasonable mind might accept as adequate to support the BZA's classification of the project as a "warehousing facility" under the Dickson County Zoning Resolutions. Accordingly, we uphold the BZA's interpretation and application of Article V, Section 5.047.1(B)(13) of the Dickson County Zoning Resolutions because the decision was not illegal, arbitrary, fraudulent, or in excess of its jurisdiction.

CONCLUSION

The judgment of the trial court is affirmed. Costs of this appeal are assessed against the appellants, for which execution may issue if necessary.

_/s/ *Andy D. Bennett*_____
ANDY D. BENNETT, JUDGE