**Gabrielle HOWELL, et al.**

v.

**METROPOLITAN SEXUALLY ORIENTED BUSINESS LICENSING BOARD.**

Court of Appeals of Tennessee, at Nashville.

Sept. 17, 2014 Session.

Nov. 5, 2014.

Application for Permission to Appeal Dismissed by Supreme Court March 3, 2015.

John E. Herbison, Clarksville, Tennessee, for the appellant, Gabrielle Howell, doing business as Gabrielle's VIP Club.

J. Brooks Fox and Emily Herring Lamb, Nashville, Tennessee, for the appellee, Metropolitan Sexually Oriented Business Licensing Board.

## OPINION

J. STEVEN STAFFORD, P.J., W.S., delivered the opinion of the Court, in which JOHN W. McCLARTY, J., and BRANDON O. GIBSON, J., joined.

Owner of a sexually oriented nightclub filed a writ of certiorari challenging the Respondent Board's decision to sanction the nightclub for the inappropriate behavior of an entertainer. The trial court affirmed the decision of the Board. The nightclub raises several errors on appeal. Discerning no error, we affirm.

This case involves a petition for a writ of certiorari filed by Petitioner/Appellant Gabrielle Howell, d/b/a Gabrielle's VIP Club (together with Ms. Howell, "the Club") to challenge the decision of the Respondent/Appellee Metropolitan Sexually Oriented Business Licencing Board

("Metro Licensing Board") to suspend its operation for thirty-one days based upon evidence that the Club violated an ordinance applicable to sexually oriented businesses.

Sexually oriented businesses are governed by various rules and regulations regarding conduct and must be licensed. On October 28, 2011, the Club was issued a sexually oriented business license by the Metro Licensing Board. The license states that it "evidences" that the Club is permitted to "conduct business as described under Chapter 6.54 of the Metropolitan Code of Laws." ("Metro Code"). The Club's license was later renewed. On March 14, 2012, the entertainer at issue in this case obtained an entertainer's permit to work in a sexually oriented business. It was undisputed that the entertainer was an independent contractor with the Club.

On March 8, 2012, two compliance inspectors, for the Metro Licensing Board, Christine Gibson and James Hodge, visited the Club. According to Ms. Gibson's later testimony, she observed an entertainer make physical contact with a patron in a "VIP room." Specifically, Ms. Gibson testified that the entertainer was "grinding her breasts on the front groin area of the customer."[1] The physical contact at issue did not take place on a stage. According to Ms. Gibson, at the time she entered into the VIP Room, the alleged improper performance was already in progress. The compliance inspector further testified that the entertainer's breasts were completely exposed at the end of the performance.

Later testimony revealed that the VIP Room is a room where customers can pay a fee to "spend time with an entertainer ... to get her away from the rest of the club or the stage." Indeed, Ms. Gibson testified, without objection, that a floor manager informed her that the customer paid $150.00 to be entertained in the VIP Room. Both compliance inspectors also testified that a manager was close by and could have seen into the VIP Room and stop the incident, but did not take any action to prevent the alleged violation. Ms. Gibson testified that out of the ten inspections they had performed over the years, the Club had been issued only one prior citation based on the conduct of another entertainer.

On March 14, 2012, the Metro Licensing Board voted to issue a citation to Ms. Howell. The Metro Licensing Board held an evidentiary hearing on June 27, 2012. The compliance inspector testified that Ms. Howell had previously been cited for having an illegal VIP dance in violation of the Metro Code, for which the Club was issued a five-day suspension. The incident report regarding the prior violation was admitted into evidence and stated that:

> [The Club] allowed or permitted an entertainer to have physical contact with a customer while engaged in a performance of sexually oriented entertainment. The Board further found that the aforementioned sexually oriented entertainment did not occur upon a stage at least eighteen inches in height or at least three feet from the customer. The Board found that these acts constituted a violation of Metropolitan Code of Laws Section 6.54.140(C).

The final decision of the Metro Licensing Board with regard to the prior violation was issued on March 24, 2011. Ms. Howell

---

1. This Court has previously stated that "[i]n this context, 'grinding' means 'an action of rotating the hips with a suggestive motion [or erotic manner](as in a dance or in a burlesque striptease).' " *Entertainer 118 v. Metropolitan Sexually Oriented Business Licensing Bd.,* No. M2008–01994–COA–R3–CV, 2009 WL 2486195, at *1 n. 2 (Tenn.Ct.App.2009) (quoting *Webster's New International Dictionary* 1000 (3d ed.1971)).

agreed to waive any right of appeal of that ruling and the Club served the five-day suspension handed down by the Metro Licensing Board.

Both compliance inspectors testified as to what they witnessed on March 8, 2012. On cross examination, Ms. Gibson admitted that the alleged violation had caused no actual harm to Metropolitan Nashville beyond the expense of sending letters and the inspectors' overtime working on the case. Ms. Howell and an employee of the Club detailed the efforts they had taken to prevent any violations of the Metro Code, including making entertainers sign pledges not to violate the Code, training, and supervision of the VIP Room. While Ms. Howell testified that she would terminate the employment of any entertainer who had violated the code, she later admitted that she had not terminated the employment of the entertainer involved in the prior violation. The floor manager charged with supervising the VIP Room on the day in question testified that he is stationed inside the VIP Room and has clear visibility of the activities inside the room. According to the floor manager, he only walked away from the VIP Room after Ms. Gibson went to the VIP Room to inspect. The floor manager testified that he walked away from the VIP Room to inquire as to who the inspectors were, as they showed no badges or identification. The floor manager indicated that while he was observing the activity in the VIP Room approximately twenty-five seconds prior to the inspectors' visit, no noncompliant activities were occurring, and that he did not see the alleged violation. Further, he testified that he was familiar with the entertainer charged with the violation, and that the Club never had problems with her compliance previously. The entertainer did not appear at the hearing, and therefore, did not testify.[2]

The Metro Licensing Board rendered a written judgment on June 28, 2012, finding that an entertainer at the Club improperly engaged in physical contact with a patron, that the subject performance did not take place on a stage at least eighteen inches high, as required by law, and that Ms. Howell, as the business licensee, was vicariously liable for the entertainer's code violations. The Metro Licensing Board entered the following findings of fact and conclusions of law, which were noted on the Board's agenda:

The Board conducted a hearing on a citation issued by the Board to Entertainer # 572 for alleged violations of Metropolitan Code of Laws Section 6.54.140(C). After considering the evidence, the Board made findings of facts as contained in the record and issued the following penalties.

Based on the facts as contained in the record, the Board found that on March 8, 2012, Entertainer # 572 had physical contact with a customer and exposed her breasts while engaged in a performance of live sexually oriented entertainment. The Board further found that aforementioned sexually oriented entertainment did not occur upon a stage at least eighteen inches in height or at least three feet from the customer. The Board found that these acts constituted a violation of Metropolitan Code of Laws Section 6.54.140(C). Therefore, the Board voted unanimously to uphold Citation No. AE 572–03082012.

Based upon this violation, the Board then considered the penalty to impose for Citation No. AE 572–03082012. The Board found that Entertainer # 572 did

2. During deliberations, Metro Licensing Board Members indicated that the entertainer "blatantly refus[ed] to come before the Board."

not have two judgments from the Board for violations of Chapter 6.54 in a 24 month period. Accordingly, the Board voted unanimously to suspend sexually oriented business permit number 572 for twenty five (25) days pursuant to Metropolitan Code of Laws Section 6.54.150(D)(2). The Board then conducted a hearing on a citation issued by the Board to Gabrielle's VIP Club for alleged violations of Metropolitan Code of Laws Sections 6.54.130(A), 6.54.140(C). After considering the evidence, the Board made findings of facts as contained in the record and issued the following penalties.

Based on the facts as contained in the record, the Board found that on March 8, 2012, Gabrielle's VIP Club allowed or permitted an entertainer to have physical contact with a customer while engaged in a performance of live sexually oriented entertainment. The Board further found that aforementioned sexually oriented entertainment did not occur upon a stage at least eighteen inches in height or at least three feet from the customer. The Board found that these acts constituted a violation of Metropolitan Code of Laws Section 6.54.130(A), 6.54.140(C). Therefore, the Board voted three to one to uphold Citation No. AE 1387–03082012.

Based upon this violation, the Board then considered the penalty to impose for Citation No. AE 1387–03082012. The Board found that Gabrielle's VIP Club did have two judgments from the Board for violations of Chapter 6.54 in a 24 month period. Accordingly, the Board voted three to one to suspend the sexually oriented business license of Gabrielle's VIP Club for thirty one (31)

days pursuant to Metropolitan Code of Laws Section 6.54.150(D)(2).

On August 24, 2012, Ms. Howell filed a petition for a writ of certiorari, arguing that the Metro Licensing Board's decision with regard to the Club was not supported by substantial and material evidence. On or around September 5, 2012, the Clerk and Master entered an order directing the Metro Licensing Board to transmit the administrative record to the Chancery Court. The administrative record was filed on November 6, 2012. On January 16, 2013, the Metro Board filed a motion to dismiss the writ of certiorari proceedings based upon the Club's failure to timely file a brief pursuant to the local rules of practice. The Club responded on February 16, 2013, asking the trial court to utilize its discretion to deny the motion despite the late filing of the Club's brief.[3]

On March 1, 2013, the Club filed its pre-hearing brief. The Metro Licensing Board filed a responsive brief on April 1, 2013. The trial court then ordered the parties to submit supplemental briefing on the issue of whether the violation found by the Metro Licensing Board was based upon a theory of strict liability. The trial court held a hearing on July 18, 2013. On September 20, 2013, the trial court entered a written judgment dismissing the petition, finding substantial and material evidence to support the Metro Licensing Board's finding of a violation of the Metro Code, as well as substantial and material evidence to support the penalty ordered by the Metro Licensing Board. Finally, the trial court found that the procedure and findings of the Metro Licensing Board did not violate due process, as it did not impose strict liability on the Club for the actions of the entertainer. The Club filed a timely notice of appeal.

---

**3.** The trial court did not specifically deny the motion, but by its action in hearing the substantive issues in this case, we can infer that the motion to dismiss was denied.

94

## Issues Presented

Appellant raises one issue and a number of sub-issues:

1. Whether the trial court erroneously dismissed the petition for common law writ of certiorari regarding review of the proceedings before the Respondent licensing board. This presents the following sub-issues:

2.

A. Whether the judgment of the Respondent licensing board is supported by substantial and material evidence.

B. Whether the Respondent licensing board imputed vicarious liability for the conduct of independent contract entertainer to the Petitioner contrary to constitutional due process guaranties.

B. Whether the suspension of the Petitioner's license to operate for thirty-one days is unconstitutionally disproportionate to the gravity of the offending entertainer's conduct.

## Any Material Evidence Standard

■ We begin with the Club's first issue, whether the decision of the Metro Licensing Board is "supported by substantial and material evidence[.]" The standard in this case, however, is not "substantial and material evidence[.]" Instead, in this common law writ of certiorari case, the Metro Licensing Board's evidentiary findings need only be supported by "any material evidence." *See Watts v. Civil Serv. Bd. for Columbia*, 606 S.W.2d 274, 276 (Tenn.1980). Our Supreme Court has articulated the standard of review in common law writ of certiorari cases:

"In such actions the reviewing court is limited to inquiry as to whether the administrative agency acted fraudulently, illegally or arbitrarily. *Hoover Motor Express Company v. Railroad and Public Utilities Commission*, 195 Tenn. 593, 261 S.W.2d 233 (1953).

＊ ＊ ＊

Under the common law writ of certiorari, questions of law only will be reviewed by the courts. An action of an administrative agency which is not supported by any evidence is arbitrary and void and may be quashed on common law writ of certiorari. Whether or not there is any material evidence to support the action of the agency is a question of law to be decided by the reviewing court upon an examination of the evidence introduced before the agency. Any additional evidence offered to the reviewing court is limited to the question of whether the agency exceeded its jurisdiction or acted fraudulently, illegally or arbitrarily. *Hoover Motor Express Co., Inc. v. Railroad & Public Utilities Commission*, 195 Tenn. 593, 261 S.W.2d 233 (1953)[;] *People's Bank of Van Leer v. Bryan*, 55 Tenn.App. 166, 397 S.W.2d 400[401 (1965)]; *Bayside Warehouse Co. v. Memphis*, 63 Tenn. App. 268, 470 S.W.2d 375 [(1971)]; *Brown v. Tenn. Real Estate Comm.*, Tenn.App.1972, 494 S.W.2d 506 [(1972)], cert. den. 414 U.S. 877, 94 S.Ct. 54, 38 L.Ed.2d 122 [(1973)]."

In the trial court, under the common law writ, reversal or modification of the action of the [ ] Board may be had only when the trial court finds that the Board has acted in violation of constitutional or statutory provisions or in excess of its own statutory authority; has followed unlawful procedure or been guilty of arbitrary or capricious action; or has acted without material evidence to support its decision. The trial court does not weigh the evidence. The scope of review by the appellate courts is no broader or more comprehensive than

that of the trial court with respect to evidence presented before the Board. *Watts,* 606 S.W.2d at 276–77.

 Review on a common law writ of certiorari is very narrow, and we do not inquire into the intrinsic correctness of the Board's decision. As we have stated:

Tennessee Code Annotated § 27–9–101 provides for judicial review of a decision by any local board or commission by the filing of a petition for a common law writ of certiorari. *See Lafferty v. City of Winchester,* 46 S.W.3d 752, 758 (Tenn.Ct.App.2000); *Wilson County Youth Emergency Shelter v. Wilson County,* 13 S.W.3d 338, 342 (Tenn.Ct.App.1999); *Walker v. Metropolitan Bd. Of Parks And Recreation,* Nos. M2007–01701–COA–R3–CV, M2008–01226–COA–R3–CV, M2008–02218–COA–R3–CV, M2008–01748–COA–R3–CV, 2009 WL 5178435 at *18 (Tenn.Ct.App. Dec. 30, 2009) (Petitions to Rehear Denied Jan. 11 and 26, 2010) (Rule 11 perm. app. denied June 30, 2010).

The scope of review under the common law writ of certiorari is very narrow. It does not involve an inquiry into the intrinsic correctness of the decision of the tribunal below, but only as to whether that tribunal has exceeded its jurisdiction, or acted illegally, fraudulently or arbitrarily. *McCallen v. City of Memphis,* 786 S.W.2d 633, 638 (Tenn. 1990); *Hutcherson v. Lauderdale County Bd. of Zoning Appeals,* 121 S.W.3d 372, 375 (Tenn.Ct.App.2003); *Lafferty v. City of Winchester,* 46 S.W.3d at 759. A court does not have the authority to reweigh the evidence or to substitute its own judgment for that of the Commission. *Hoover, Inc. v. Metro Bd. Of Zoning Appeals,* 924 S.W.2d 900, 904 (Tenn. Ct.App.1996). If there is no material evidence to support a tribunal's action, it

is arbitrary or illegal. *Harding Academy v. Metropolitan Government of Nashville,* 207 S.W.3d 279, 283 (Tenn.Ct. App.2006); *Wilson County Youth Emergency Shelter v. Wilson County,* 13 S.W.3d at 342; *Sexton v. Anderson County,* 587 S.W.2d 663, 667 (Tenn.Ct. App.1979).

The trial court's review of the evidence is confined to the administrative record, except that additional evidence may be introduced for the sole purpose of determining whether the tribunal below has exceeded its jurisdiction, or acted illegally, fraudulently or arbitrarily. Tenn.Code Ann. § 27–9–111(b); *Watts v. Civil Serv. Bd. for Columbia,* 606 S.W.2d 274, 277 (Tenn.1980); *Hemontolor v. Wilson County Board of Zoning Appeals,* 883 S.W.2d 613, 618 (Tenn.Ct. App.1994).

Our review of the evidence on appeal can be no broader or more comprehensive than the trial court's review. *Watts v. Civil Serv. Bd. for Columbia,* 606 S.W.2d at 277; *Jacks v. City of Millington Bd. of Zoning Appeals,* 298 S.W.3d 163, 167 (Tenn.Ct.App.2009).

*Shute v. Metro. Gov't of Nashville,* No. M2009–01417–COA–R3–CV, 2010 WL 3064362, at *3–4 (Tenn.Ct.App. Aug. 5, 2010), *perm. app. denied* (Tenn.Dec.7, 2010).

The issues in this case are governed by several provisions of the Metro Code. Some of the issues raised by the Club involve the construction and interpretation of the Metro Code. The Tennessee Supreme Court has held that the familiar rules of statutory construction apply in writ of certiorari cases:

Our role in statutory interpretation is to carry out legislative intent without broadening or restricting the statute beyond its intended scope. We find legislative intent in the plain and ordinary

meaning of the statutory language when it is unambiguous. When the statute's meaning is in question, however, we may rely on rules of statutory construction. *State v. L.W.*, 350 S.W.3d 911, 916 (Tenn. 2011) (citing *State v. Marshall*, 319 S.W.3d 558, 561 (Tenn.2010)) (internal citations omitted).

Accordingly, we turn to the language of the Metro Code. The entertainer was found to have violated Metro Code Section 6.54.140(C), which provides:

> No customer shall be permitted to have any physical contact with any entertainer on the licensed premises while the entertainer is engaged in a performance of live sexually oriented entertainment. All performances of live sexually oriented entertainment shall only occur upon a stage at least eighteen inches above the immediate floor level and removed at least three feet from the nearest customer.

Thus, to be found in violation of Metro Code Section 6.54.140(C), the entertainer must have been engaged in the performance of live sexually oriented entertainment and have either physical contact with a customer or not be on a proper stage. Here, the Board concluded that the entertainer was engaged in the performance of live sexually oriented entertainment, had physical contact with a customer, and was not on an appropriate stage. The Club was found to be vicariously liable for the entertainer's violation based upon Metro Code Section 6.54.130(A), which provides:

> An operator is responsible for the conduct of all entertainers while on the licensed premises and any act or omission of any entertainer constituting a violation of the provisions of this chapter shall be deemed the act or omission of the operator for purposes of determining whether the operator's license shall be revoked, suspended, renewed or a penalty assessed subject to the limits described in Section 6.54.150(E).

As an initial matter, we note that the Club does not raise any argument that the above ordinances are facially unconstitutional or over-broad, other than their strict liability argument and their argument about the penalty imposed, discussed in detail *infra*. In addition, the Club does not appear to argue that its operations are not subject to the above regulations. Instead, the Club argues that the Metro Licensing Board erred in finding a violation of Metro Code Section 6.54.140(C) because "there is no evidence that [the entertainer] has regularly presented offstage nudity of any variety in or about the licensed premises." Specifically, the Club focuses its argument on the contention that the entertainer was not engaged "in a performance of live sexually oriented entertainment" at the time of the alleged violation, as that term is defined in the Metro Code.

"[S]exually oriented entertainment" is defined as: "the regular presentation, for a fee or incidentally to another service, of material or exhibitions distinguished or characterized by an emphasis on matter depicting, describing or relating to 'specified sexual activities' or 'specified anatomical areas' as defined in this section for observation by patrons therein." Metro. Code § 6.54.010(AA). "[S]pecified anatomical areas" means "[l]ess than completely and opaquely covered ... human genitals, pubic region, buttocks, [or] female breasts below a point immediately above the top of the areola." Metro. Code § 6.54.010(CC). "Specified sexual activities" is defined as:

1. Human genitals in a state of sexual stimulation or arousal;

2. Acts of human masturbation, sexual intercourse or sodomy;

3. Fondling or erotic touching of human genitals, pubic region, buttock or female breasts.

Metro.Code § 6.54.010(DD).

The parties in this case focus their arguments on whether the violation of Metro Code Section 6.54.130(A) requires that the action that is the basis of the violation be a part of the "regular" presentation of the sexually oriented business. According to the Club, the term "regularly" in the Metro Code applies to both the presentation of material or exhibitions, *see* Metro. Code § 6.54.130(A), and therefore, must apply to any alleged violation of the ordinance. The term "regular" is generally defined as "customary, usual, or normal." *The American Heritage College Dictionary* 1172 (4th ed.2002); *see also State v. Majors,* 318 S.W.3d 850, 859 (Tenn.2010) (noting that where appropriate, courts may utilize dictionary definitions in interpreting legislative acts). Thus, the Club argues that the presentation of the "specified" material or exhibitions in prohibited parts of the Club (i.e., off-stage) must have been the customary, usual, or normal conduct or business of the Club in order for there to be a violation. The Club points to testimony from the compliance inspectors indicating that of the ten previous inspections of the Club, the inspector only found non-compliance twice, in situations involving different entertainers. Because the Club contends that there is no evidence in the record to support a finding that the entertainer regularly engaged in the conduct alleged (i.e., physically touching a customer or off-stage nudity) while not on a proper stage, the Club argues that the Metro Licensing Board failed to meet their burden to prove a violation of the Metro Code.

The Metro Licensing Board, on the other hand, argues that the term "regular" does not apply to the actions at issue in this case. According to their brief:

[The] Club also argues that there is no evidence that the entertainer "regularly presented" offstage nudity at the club. But the Ordinance defines sexually oriented entertainment as "the regular presentation, for a fee or incidentally to another service, of material *or* exhibitions distinguished or characterized by an emphasis on matter depicting, describing or relating to specified sexual activities or specified anatomical areas." There is no requirement in the Ordinance, therefore, that the exhibition be regular. Metro is not required to prove that the club "regularly" presented the service but rather that the exhibition was characterized by an emphasis on matter related to specified sexual activities.

Thus, Metro Licensing Board argues that "exhibitions" need not be regular, only the presentation of "material" need meet that requirement. We note, however, that the Metro Licensing Board cites no law or other code provisions to support this interpretation of the ordinance.

■ The ordinances governing sexually oriented businesses in Metro Nashville are certainly not a model of clarity. The United States Court of Appeals for the Sixth Circuit, faced with a constitutional challenge to the ordinances, indicated that "these constitutional issues would never have arisen had the Ordinance been written more clearly." *Deja Vu of Nashville, Inc. v. Metro. Gov't of Nashville,* 274 F.3d 377, 388 n. 2 (6th Cir.2001) (describing some of the terms in the ordinance as "meaningless"). From our reading of the relevant ordinances, however, we disagree with both the Club's and the Metro Licensing Board's interpretation of the ordinance at issue. From our reading, the ordinance clearly requires that the presentation of either material or exhibitions defined by the ordinance be regular in order to quali-

fy as sexually oriented entertainment. Accordingly, we reject the Metro Licensing Board's contention that the term "regular" modifies only exhibitions or otherwise was not required to be shown in this case.

We also reject the Club's argument that there is no evidence in the record to support the Metro Licensing Board's finding that the entertainer was indeed engaged in the regular presentation of sexually oriented entertainment in this case. It is curious to this Court that the Club argues that its entertainer was not engaged in the performance of live sexually oriented entertainment given that the Club has applied for and renewed its license as a "sexually oriented nightclub,"[4] and the entertainer was engaged in the Club's business at the time of the alleged violation. As defined by the Metro Code, a "sexually oriented nightclub" means "a theater, concert hall, auditorium, nightclub, bar, restaurant, or similar commercial establishment which **regularly** features live performances that are characterized by any actual or simulated performance of 'specified sexual activities' or the exposure of 'specified anatomical areas,' as defined in this section." Metro. Code § 6.54.130(Z)(2) (emphasis added). Again, the Club does not argue that its operations are not governed by the Metro Code or that it is not properly termed a "sexually oriented nightclub." Thus, the Club appears to waive any argument that its typical operations "**regularly** feature[ ] live performances that are characterized by any actual or simulated performance of 'specified sexual activities' or the exposure of 'specified anatomical areas[.]'" Indeed, Ms.

Howell agreed with the statement at the hearing that nudity is not allowed at the Club, "apart from the stage area." Thus, the evidence allows a reasonable inference that nudity (i.e., exposure of "specified anatomical areas") is permitted as a regular presentation of the Club, but only from the stage area. Clearly, the entertainer at issue was engaged in the business of the Club at the time of the violation, as she was in a room of the Club specifically designed to allow customers more private contact with the entertainers. Furthermore, the entertainer has a permit to "operate as an [entertainer in a sexually oriented business." Because the entertainer was engaged in the regular, typical operations of the club by entertaining her customer in the VIP Room, we must conclude that she was engaged in the presentation of sexually oriented entertainment for purposes of this case.

Further, we disagree with the Club's extremely narrow interpretation of the term "sexually oriented entertainment." From our understanding of the Club's argument, there is no violation of Metro Code Section 6.54.140(c) and no "sexually oriented entertainment," unless the entertainment directly involves the regular presentation of specified sexual activities or anatomical areas in prohibited parts of the Club, specifically off-stage nudity. To so hold would be to render the ordinance essentially meaningless and would require multiple, regular violations before a sexually oriented business could be sanctioned. However, the Metro Code makes clear that even the first violation of the Chapter

4. Although not specifically testified to in the record, it is clear that the Club is properly termed a "sexually oriented nightclub." In order to be governed by Metro Code Chapter 6.54, a sexually oriented business must either qualify as a "sexually oriented nightclub," "sexually oriented bookstore," "sexually oriented theater," or "sexually oriented video store." Nothing in the record suggests that the Club is a bookstore, theater, or video store.

6.54 is sanctionable. *See* Metro. Code § 6.54.150(B)(2) (setting the penalty "[u]pon the first violation of Chapter 6.54"). We are constrained to construe legislative actions in a way that does not lead to absurd or impracticable results, *Abdur'Rahman v. Bredesen*, 181 S.W.3d 292, 313 (Tenn.2005) (citing *McClellan v. Bd. of Regents of the State Univ.*, 921 S.W.2d 684, 689 (Tenn.1996)). Additionally, this Court must give effect to every word in the text and cannot construe an enactment so that one "section will destroy another." *State ex rel. Working v. Costa*, 216 S.W.3d 758, 769 (Tenn.Ct.App.2006) (citing *Mangrum v. Owens*, 917 S.W.2d 244, 246 (Tenn.Ct.App.1995). We, therefore, cannot construe Chapter 6.54 in such a manner that would prevent the Metro Licensing Board from sanctioning a sexually oriented business for its first violation, as clearly contemplated in Metro Code Section 6.54.150(B)(2).

█ Moreover, despite the Club's apparent contention otherwise, sexually oriented entertainment does not require the regular presentation of "material or exhibitions" in which specified sexual activities occur or specified anatomical areas are shown in prohibited parts of the Club. Instead, Section 6.54.010(AA) merely provides that the material or presentation be "distinguished or characterized by an emphasis on matter depicting, describing **or relating to**" specified sexual activities or anatomical areas (emphasis added). This requirement is far more broad than argued by the Club and can include performances that do not directly involve specified actions or anatomical areas. Because performances in the VIP Room are ancillary to the live sexually oriented entertainment on the stage in the Club, the activities in the VIP Room clearly "relate] to" the presentation or exhibitions of specified

sexual activities or anatomical areas on stage in the Club.

The trial court also did not accept the Club's interpretation of the ordinance. According to the trial court:

In the face of the record establishing the essential elements of the applicable Code sections of physical contact and payment of a fee, the Court now turns to the petitioner's challenge to the record with respect to the "regular presentation" element, required to be established by the definitional section 6.54.110(AA). Based upon facts and authorities provided at pages 17–20 of the March 1, 2013 *Prehearing Brief Of Petitioner Regarding Review By Writ of Certiorari*, the petitioner asserts at page 20, "These authorities and the proof adduced before the Respondent Board show that in the matter at bar there is no evidence of *regular presentation of* nude entertainment at the Petitioner's business establishment other than onstage in accordance with the requirements of Chapter 6.54." The contrary, the Court concludes, is established in the record.

The undisputed testimony is that the VIP Room where the physical contact occurred is just another place in the Club where sexually oriented entertainment, in addition to that onstage, takes place. The VIP Room is not in a separate building. The VIP Room is an area sectioned off within the same club building as the stage. Moreover, it is the same entertainers from onstage who work the VIP Room. There the entertainers continue to entertain customers with an air dance. However, the entertainment in the VIP Room is not on a stage but in an area with couches, and the entertainment is private between the customer and the entertainer.

\* \* \*

From this testimony, the Court finds that the VIP Room fits the definition of "sexually oriented entertainment" as the Room is an adjunct to entertainment being performed on stage in the Club: the same onstage persons entertaining but in a private setting and offstage. These facts of record constitute substantial and material evidence to establish the essential element of "regular presentation" contained in Code section 6.54.110(AA) and required for finding a violation of section 6.54.140(C). Were the Court to adopt the petitioner's very narrow construction of "regular presentation," it "goes far beyond the natural and ordinary words of the ordinance" and "unreasonably narrows the ability to achieve at least one of the purposes of the provision: to 'redress the high instances of sex crimes prevalent at sexually oriented businesses.'" *Entertainer 118 v. Metropolitan Sexually Oriented Business,* 2009 WL 2486195 (Tenn.Ct. App. August 14, 2009).

We fully agree with the trial court. The Club does not dispute that its activities and business qualify it as a sexually oriented business/nightclub. Thus, its operations "**regularly** feature[ ] live performances that are characterized by any actual or simulated performance of 'specified sexual activities' or the exposure of 'specified anatomical areas[.]'" Metro. Code § 6.54.130(Z)(2). An entertainer with a permit to entertain in a sexually oriented business and contracted to perform at the nightclub would, *ipso facto,* also be engaged in sexually oriented entertainment. Thus, the Metro Licensing Board did not err in concluding that the entertainer was engaged in sexually oriented entertainment at the time of the alleged violation. *See also Entertainer 118 v. Metro. Sexually Oriented Bus. Licensing Bd.,* No. M2008–01994–COA–R3–CV, 2009 WL 2486195, at *6 (Tenn.Ct.App.2009) (holding that an entertainer in an adult establishment "grinding" on a customer fell within the definition of sexually oriented entertainment).

Finally, we note that even if we were to interpret "sexually oriented entertainment" in the extremely narrow fashion advocated by the Club, material evidence exists in the record to support a conclusion that the entertainer was engaged in the regular presentation of specified sexual activities or anatomical areas. As previously discussed, the Club was previously found in violation of Metro Code Section 6.54.140(C) for the exact same conduct involved in this case—allowing an entertainer to have physical contact with a customer while engaged in a performance not on an appropriate stage. While this evidence may not be substantial in showing that the Club allowed the regular presentation of specified sexual activities or anatomical areas in prohibited parts of the Club, we conclude that it is sufficient to withstand the deferential "any material evidence" standard applicable in this case. In *Heyne v. Metropolitan Nashville Board of Public Education,* our Supreme Court defined the nature and quantum of evidence needed to uphold a board's decision under writ of certiorari review:

> For the purpose of this inquiry, "material evidence" is relevant evidence that a reasonable person would accept as adequate to support a rational conclusion. *Hedgepath v. Norton,* 839 S.W.2d 416, 421 (Tenn.Ct.App.1992) (quoting *Pace v. Garbage Disposal Dist.,* 54 Tenn.App. 263, 267, 390 S.W.2d 461, 463 (1965)). The amount of material evidence required to support an agency's decision "must exceed a scintilla of evidence but may be less than a preponderance of the evidence." *Leonard Plating Co. v. Metropolitan Gov't of Nashville & Davidson Cnty.,* 213 S.W.3d at 904.

*Heyne v. Metro. Nashville Bd. of Pub. Educ.*, 380 S.W.3d 715, 738 (Tenn.2012). Here, the evidence shows that the Club maintains a VIP Room for the specific purpose of allowing a customer to obtain more private time with an entertainer. Twice in a twenty-four-month period, the Club was cited for allowing an entertainer to have inappropriate contact with a customer. While this may be less than a preponderance of evidence showing that this is a regular activity in the Club, it is certainly more than a scintilla. Accordingly, we will not disturb the Metro Licensing Board's finding on this issue.

Our holding that the presentation of material or exhibitions of the type defined in Metro Code Section 6.54.130(A), however, does not end our inquiry. Instead, we must next determine whether the record contains any material evidence to support the finding that the entertainer violated the above provision. We conclude that it does. First, as previously determined, the entertainer was engaged in sexually oriented entertainment at the time of the violation. Next, the testimony of both compliance inspectors establishes that the entertainer had physical contact with the customer and that the physical contact was not on a proper stage as required by Metro Code Section 6.54.140(C). In addition, the testimony of the compliance inspectors establishes that the entertainer was engaged in "specified sexual activities," and exposed "specified anatomical areas." *See* Metro. Code §§ 6.54.010(CC), (DD). Evidence in the record also shows that the Club charged a $150.00 fee to enter the VIP room where the violation occurred. Accordingly, the essential elements of a violation are clearly met in this case.

The Club next argues that the Metro Licensing Board erred in suspending its license on the basis of Metro Code Section 6.54.150(B)(1). Metro Code Section 6.54.150(B) provides:

B. The board shall either fine, suspend or fine and suspend a license for any of the following reasons, that are not sufficient grounds for revocation:

1. The licensee fails to maintain the licensed premises in a sanitary or safe condition by allowing a violation of Chapter 6.54, Tennessee Code Annotated Section 57–4–204 or Metropolitan Code Section 7.24.030

The licensee may affirmatively prove as a defense to an alleged violation of Chapter 6.54, Tennessee Code Annotated Section 57–4–204 or Metropolitan Code Section 7.24.030 that he/she did not know, or through the exercise of due diligence could not have known of his/her employee's acts or omissions or an entertainer's act or omissions. If the licensee knew or should have known that his/her employee or an entertainer was violating any such subsection of Chapter 6.54, Tennessee Code Annotated Section 57–4–204 or Metropolitan Code Section 7.24.030, the licensee may still affirmatively prove as a defense to the alleged violation that he/she was powerless to prevent the unsafe or unsanitary condition.

2. Upon the first violation of Chapter 6.54, Tennessee Code Annotated Section 57–4–204 or Metropolitan Code Section 7.24.030 within a twenty-four-month period, not including periods of suspensions, the licensee shall either be fined five hundred dollars or his/her license shall be suspended for a period no less than five days and no longer than thirty days or the licensee shall be both fined five hundred dollars and his or her license suspended for a period of not less than five days and no longer than thirty days.

3. Upon the second violation of Chapter 6.54, Tennessee Code Annotated Section 57–4–204 or Metropolitan Code Section 7.24.030 within a twenty-four-month period, not including periods of suspensions, the license shall be suspended no less than thirty-one days and no longer than ninety days.

A second violation of Chapter 6.54, shall mean a prior judgment from the board, unless the decision of the board is appealed and overturned, that the licensee violated Chapter 6.54 within a twenty-four-month period, not including any period of suspension. The fact that the board's judgment is being appealed shall have no affect on the determination that the violation occurred previously until such time as the judgment of the board is reversed.

The Club argues that there is no evidence in the record that Ms. Howell "fail[ed] to maintain the licensed premises in a sanitary or safe condition," as required under Metro Code Section 6.54.150(B)(1). The Metro Licensing Board, however, argues that the basis of the Club's suspension was not based upon a violation of Section 6.54.150(B)(1), but instead was based upon a violation of Section 6.54.150(B)(3), which bases a suspension on a second violation within a twenty-four month period. We agree with the Metro Licensing Board.

Here, the evidence in the record establishes that the Club was cited for a violation of the same provision of the Metro Code on March 24, 2011, less than twelve months from the violation at issue in this case. The Club does not argue that the first violation occurred more than twenty-four months prior to the violation at issue in this case. Instead, it argues that the Metro Licensing Board was required to prove both that there was second violation and that the violation caused the premises to be in a safe or unsanitary condition. We respectfully disagree. Section 6.54.150(B) specifically states that the Metro Licensing Board may suspend a license for "**any** of the following reasons." (emphasis added). Accordingly, only one of the above provisions need to be met in order to justify a suspension. Indeed, another provision of the Metro Code provides that the Board may suspend "any license/permit for a specified period of time for **each offense** listed in Section 6.54.150B or D." Metro. Code § 6.54.160(A)(2) (emphasis added). Under the Club's interpretation of Section 6.54.150(B), there is only one offense for which a license could be suspended pursuant to that section, an interpretation clearly contrary to the language of Section 6.54.160(A)(2). Consequently, we conclude that subsections (1), (2), and (3) of Metro Code Section 6.54.150(B) are separate and distinct bases for a suspension. Because it is undisputed that the violation at issue in this case was the second such violation by the Club in a twenty-four month period, there was material evidence to support the suspension pursuant to Section 6.54.150(B)(3).

## Vicarious Liability

The Club next argues that the Metro Licensing Board erred in finding the Club vicariously liable for the entertainer's violation because to do so would be to hold the Club to a standard of strict liability, in violation of due process. "The protections of procedural due process apply to administrative proceedings[,]" so long as the party alleging the due process violation has a protected liberty interest. *Martin v. Sizemore*, 78 S.W.3d 249, 263 (Tenn.Ct.App. 2001). With regard to the issue of whether a party has a protected liberty interest, this Court has opined:

The Due Process Clause of the Fourteenth Amendment and Tenn. Const. art. I, § 8 provide similar procedural

protections and guarantees. *Riggs v. Burson,* 941 S.W.2d 44, 51 (Tenn.1997); *State v. AAA Aaron's Action Agency Bail Bonds, Inc.,* 993 S.W.2d 81, 85 (Tenn.Crim.App.1998); *Eye Clinic, P.C. v. Jackson–Madison County Gen. Hosp.,* 986 S.W.2d 565, 578 (Tenn.Ct. App.1998). Both provisions provide procedural protections for property and liberty interests against arbitrary governmental interference. *Armstrong v. Department of Veterans Affairs,* 959 S.W.2d 595, 598 (Tenn.Ct.App.1997). While they contain a guarantee of fair process, *Zinermon v. Burch,* 494 U.S. 113, 125, 110 S.Ct. 975, 983, 108 L.Ed.2d 100 (1990); *Daniels v. Williams,* 474 U.S. 327, 337, 106 S.Ct. 677, 678, 88 L.Ed.2d 662 (1986), they do not prevent the deprivation of property interests. Rather, procedural due process guards against unfair or mistaken deprivations of property interests. *Fuentes v. Shevin,* 407 U.S. 67, 80–81, 92 S.Ct. 1983, 1994, 32 L.Ed.2d 556 (1972).

The threshold consideration with regard to any procedural due process claim is whether the plaintiff has a liberty or property interest that is entitled to protection under U.S. Const. amend. XIV, § 1 and Tenn. Const. art. I, § 8. *Rowe v. Board of Educ.,* 938 S.W.2d 351, 354 (Tenn.1996); *Armstrong v. Department of Veterans Affairs,* 959 S.W.2d at 597–98. To qualify for constitutional protection, a property interest must be more than a "unilateral expectation" or an "abstract need or desire." It must be a "legitimate claim of entitlement" created and defined by "existing rules or understandings that stem from an independent source such as state law." *Board of Regents v. Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972); *Rowe v. Board of Educ.,* 938 S.W.2d at 354; *Eye Clinic, P.C. v. Jack-son–Madison County Gen. Hosp.,* 986 S.W.2d at 578.

The types of interests entitled to protection as property interests are varied. However, they share the common characteristic that they are an individual entitlement, grounded in state law, that cannot be removed except "for cause." *Logan v. Zimmerman Brush Co.,* 455 U.S. 422, 430, 102 S.Ct. 1148, 1155, 71 L.Ed.2d 265 (1982); *Armstrong v. Department of Veterans Affairs,* 959 S.W.2d at 598. The United States Supreme Court has recognized the constitutional significance of a person's interest in remaining employed. *Gilbert v. Homar,* 520 U.S. 924, 932, 117 S.Ct. 1807, 1813, 138 L.Ed.2d 120 (1997); *Cleveland Bd. of Educ. v. Loudermill,* 470 U.S. 532, 543, 105 S.Ct. 1487, 1494, 84 L.Ed.2d 494 (1985). Thus, the right to engage in a chosen profession or occupation without unreasonable governmental interference or deprivation is both a property and a liberty interest protected by the Due Process Clause of the Fourteenth Amendment and Tenn. Const. art. I, § 8. *Greene v. McElroy,* 360 U.S. 474, 492, 79 S.Ct. 1400, 1411, 3 L.Ed.2d 1377 (1959); *Livesay v. Tennessee Bd. of Exam'rs in Watchmaking,* 204 Tenn. 500, 503, 322 S.W.2d 209, 211 (1959); *State v. AAA Aaron's Action Agency Bail Bonds, Inc.,* 993 S.W.2d at 85.

*Martin,* 78 S.W.3d at 262.

■ There is no dispute in this case that Ms. Howell, as the licensee for the Club, had a protected interest in maintaining the license. *See Lee v. City of Newport,* 947 F.2d 945 (Table), 1991 WL 227750, at *5 (6th Cir.1991) (holding that the owner/licensee of a sexually oriented nightclub had a protected property interest in maintaining the license). Accordingly, an effort by

the government to suspend or revoke the license must comport with due process:

> Revocation precludes the licensee from operating the business and thus even a temporary suspension or revocation will have substantial consequences for a licensee. "License revocations are so serious as to be treated ' "in the nature of criminal proceedings." ' ... Procedural requirements are therefore rigorous for a license revocation proceeding." *Richards v. Emanuel County Hospital Authority,* 603 F.Supp. 81, 85 (S.D.Ga.1984) (citing [*Wall v. ]American Optometric Association, Inc.,* 379 F.Supp. 175 (N.D.Ga.), *aff'd* 491[419] U.S. 888[, 95 S.Ct. 166, 42 L.Ed.2d 134] (1974)). A licensee is thus entitled to have the opportunity to be heard both at a meaningful time and in a meaningful manner. *Barry v. Barchi,* 443 U.S. 55, 99 S.Ct. 2642, 2650, 61 L.Ed.2d 365 (1979).

*Lee,* 1991 WL 227750, at *5.

Having determined that Ms. Howell and the Club had a protected liberty interest in maintaining a sexually oriented business license, we must next consider what process was due:

> The courts commonly consider three factors when called upon to determine what procedural protections a particular circumstance requires. These factors include: (1) the nature of the private interest affected by the official action, (2) the risk of erroneous deprivation of that interest through the procedures used and the probable value, if any, of additional or substitute procedural safeguards, and (3) the government's interests, including the function involved and the fiscal and administrative burdens that any additional or substitute safeguard would entail. *Mathews v. Eldridge,* 424 U.S. 319, 335, 96 S.Ct. 893, 903, 47 L.Ed.2d 18 (1976); *Wilson v.*

> *Wilson,* 984 S.W.2d 898, 902 (Tenn. 1998). In this context, courts have also considered the length and finality of the deprivation, *Logan v. Zimmerman Brush Co.,* 455 U.S. at 434, 102 S.Ct. at 1157, and the availability of later appeals. *Frank's Livestock & Poultry Farm, Inc. v. United States,* 905 F.2d 1515, 1518 (Fed.Cir.1990).

> Procedural due process does not require perfect, error-free governmental decision-making. *Mackey v. Montrym,* 443 U.S. 1, 13, 99 S.Ct. 2612, 2618, 61 L.Ed.2d 321 (1979); *Eye Clinic, P.C. v. Jackson–Madison County Gen. Hosp.,* 986 S.W.2d at 578. It does, however, require affording persons like Mr. Martin a relatively level playing field in a contested case hearing. The state should not be permitted to maintain such an unfair strategic advantage that a pall is cast over the fairness of the proceeding. *In re Detention of Kortte,* 317 Ill.App.3d 111, 250 Ill.Dec. 514, 738 N.E.2d 983, 986 (2000). Thus, due process demands a fair trial before a neutral or unbiased decision-maker. *Bracy v. Gramley,* 520 U.S. 899, 904–05, 117 S.Ct. 1793, 1797, 138 L.Ed.2d 97 (1997); *Withrow v. Larkin,* 421 U.S. 35, 46, 95 S.Ct. 1456, 1464, 43 L.Ed.2d 712 (1975); *Ogrodowczyk v. Tennessee Bd. for Licensing Health Care Facilities,* 886 S.W.2d 246, 252–53 (Tenn.Ct.App.1994) (Cantrell, J., concurring); 2 Kenneth C. Davis & Richard J. Pierce, Jr., *Administrative Law Treatise* § 9.8 (3d ed. 1994) ("Administrative Law Treatise"). It also demands an appearance of fairness and the absence of probability of outside influence on the adjudication. *Utica Packing Co. v. Block,* 781 F.2d 71, 77–78 (6th Cir.1986).

*Martin,* 78 S.W.3d at 263–64. The Tennessee Court of Appeals has outlined the

minimum process due in an administrative proceeding:

> The minimum requirements of due process must ... be satisfied when an agency's decision could adversely affect vested property interests or other constitutional rights. While due process does not dictate particular procedures that must be used in every instance, ..., at a minimum, administrative proceedings must afford affected parties **(1) adequate notice, ... (2) an opportunity for a hearing at a meaningful time and in a meaningful manner, ... and (3) an opportunity to obtain judicial review of the board's or agency's decision.**

*Martin,* 78 S.W.3d at 267 (internal citations omitted) (emphasis added).

In this case, the Club does not argue that it received inadequate notice, that it was deprived of an opportunity for a hearing at a meaningful time and in a meaningful manner, or that it was deprived of judicial review of the Metro Licensing Board's decision. Instead, the Club argues that to hold the Club vicariously liable for the actions of its entertainers is a violation of due process. Although this issue has not been directly addressed by our courts, we take guidance from two decisions by the United States Court of Appeals for the Sixth Circuit.

First, in *Lee v. City of Newport,* 947 F.2d 945 (Table), 1991 WL 227750 (6th Cir.1991), the owner of an adult oriented nightclub was issued a notice of revocation of her business license based upon three prostitution convictions involving two former employees of the club. The prostitution occurred on club premises. The owner's "uncontradicted testimony was that she was not aware of prostitution or solicitation occurring on the premises of the Brass Bull prior to these convictions." *Id.* at *2. In addition, the owner testified that she required employees sign a contract in which they are notified that prostitution is not permitted on the premises and that she holds meetings to ensure that employees know that she does not condone such activities. *Id.* Regardless of this testimony, the City's Board of Commissioners voted to revoke the license to operate the club. Specifically, the ordinance at issue stated that revocation or suspension of the business license was required:

> If, within twelve months prior to the date on which charges are filed, there has been a conviction of any licensee or his agent, servants or employees, for any action or activity occurring in, on, or at the premises covered by the license, in violation of any provision of this division or any other division of the City of Newport, or of any criminal or penal statute of the Commonwealth of Kentucky against gambling, disorderly conduct, or any other criminal or penal offense, and a judgment of conviction in any court of competent jurisdiction shall be conclusive evidence of such violation.

*Id.* at *1. Because two of the owner's employees had been convicted, the Board of Commissioners voted that the license must be revoked. *Id.* at *3.

The owner filed an application for injunctive relief in the United States District Court on the basis that the ordinance unfairly imposed strict liability on the owner for the conduct of her employees. The District Court, however, rejected the owner's argument and upheld the revocation. The Sixth Circuit Court of Appeals reversed, holding that the ordinance imposed an impermissible "irrebuttable presumption" on the club owner. *Id.* at *4 (citing *Weinberger v. Salfi,* 422 U.S. 749, 95 S.Ct. 2457, 2468, 45 L.Ed.2d 522 (1975)). In addressing this issue, the Court explained:

> In assessing the constitutionality of a presumption, its operation on a protecta-

ble right, such as the property interest at stake in the present case, to preclude a licensee from putting on evidence in defense or from having that evidence meaningfully considered can result in a violation of the guarantee of due process embodied in the Fourteenth Amendment.

*Lee*, 1991 WL 227750, at *4. The Court of Appeals thus concluded that depriving a party of presenting evidence regarding their attempted compliance with a rule or ordinance was likely to violate due process. As explained by the Court of Appeals:

In *Vlandis v. Kline*, 412 U.S. 441, 93 S.Ct. 2230[, 37 L.Ed.2d 63] (1973), the Supreme Court of the United States observed that

"[t]he State's interest in administrative ease and certainty cannot, in and of itself, save [a] conclusive presumption from invalidity under the Due Process Clause where there are otherwise reasonable and practicable means of establishing the pertinent facts on which the State's objective is premised.... Rather, standards of due process require that the State allow such an individual the opportunity to present evidence...."

93 S.Ct. at 2236. Due process afforded to a person prior to deprivation of a license must be meaningful and appropriate to the case:

"It is a proposition which hardly seems to need explication that a hearing which excludes consideration of an element essential to the decision whether licenses of the nature here involved shall be suspended does not meet this standard."

*Bell v. Burson*, 91 S.Ct. at 1591.

*Lee*, 1991 WL 227750, at *6. Based on the foregoing law, the Sixth Circuit Court of Appeals concluded that the ordinance at issue employed an improper irrebuttable presumption on the owner of the club:

In addition, although the District Court presumed that the [owner] knew that prostitution was occurring on the premises of the [club], the wording of the ordinance would not require the application of a presumption of knowledge to obtain a revocation. All that is necessary to warrant revocation under this ordinance as written is for any employee, servant, or agent of the licensee to have been convicted even once of violating any ordinance of the City or any criminal law of the State of Kentucky. Consequently, if a bookkeeper for the [owner] was convicted of embezzlement from the [owner], the [owner's] occupational license could be revoked, despite the fact that the [owner] would be highly unlikely to know that her bookkeeper was engaged in this kind of criminal activity, since if she were aware of it she would probably take some action to stop it. The ordinance is thus a strict liability provision and the District Court's finding of presumed knowledge was both unnecessary under the ordinance as drafted to obtain a revocation and created an essentially irrebuttable presumption that was contrary to the uncontested evidence that the [owner] did not know that her employees were engaged in prostitution and that she took reasonable steps to attempt to prevent such conduct on her premises. Nothing that the [owner] could have shown at her hearing before the City commissioners or in the District Court would have prevented the ordinance from being applied as written.

*Id.* at *7. Thus, the Court of Appeals held that the ordinance could not pass constitutional muster.

While the issue in *Lee* concerned strict liability for the convictions of the busi-

ness's employees or agents, the issue in this case concerns violations of the Metro Code by an entertainer of the Club. The Club argues that:

> [The Metro Licensing Board] applied the Ordinance at issue here in precisely the same manner as the constitutionally impermissible presumption applied by the District Court in *Lee.* Indeed, the language of Code § 6.54.130(A) regarding imputation of employees' and entertainers' conduct to the licensed operator, encouraged (if not required) the Board to do so.
>
> In both cases the operator of the business testified before the licensing authority and offered uncontroverted testimony as to prophylactic measures and procedures. In both cases that evidence was not meaningfully considered. The ordinance as so applied here offends Due Process guaranties.

(footnote omitted).

We respectfully disagree that the ordinance at issue in *Lee* is analogous to Metro Code Section 6.54.130(A), nor do we conclude that the language of Metro Code Section 6.54.130(A) required the Metro Licensing Board to find the Club vicariously liable for the actions of the entertainer regardless of any prophylactic measures undertaken by the Club or its owner. We also disagree that the evidence presented by Ms. Howell regarding her efforts to ensure compliance with the Metro Code were not "meaningfully considered" by the Metro Licensing Board.

■ First, we note that unlike the ordinance at issue in *Lee,* Metro Code Chapter 6.54 allows the owner/license holder to present evidence regarding their attempts to ensure compliance with the require-

ments of the ordinance. According to Metro Code Section 6.54.1(B)(1):

> The licensee may affirmatively prove as a defense to an alleged violation of Chapter 6.54 that the licensee did not know, or through the exercise of due diligence could not have known that his/her employees' acts or an entertainer's acts would violate Chapter 6.54. If the licensee knew or should have known that his/her employees' acts or an entertainer's acts were violating any subsection of Chapter 6.54, the licensee may still affirmatively prove as a defense to the violation that the licensee was powerless to prevent the continuing unsafe or unsanitary condition.[5]

Thus, where in *Lee* "the wording of the ordinance would not require the application of a presumption of knowledge to obtain a revocation" because knowledge was irrelevant to the club owner's liability, Metro Code Section 6.54.150(B)(1) specifically provides that a licensee may raise as a defense that he or she "did not know, or through the exercise of due diligence could not have known" that an entertainer was violating Metro Code Chapter 6.54. Because a licensee's knowledge is a relevant consideration, Chapter 6.54 does not impose strict liability on a licensee. In addition, because a licensee may present evidence that they were "powerless to prevent" the violation, the ordinance does not contain an irrebuttable presumption that may not be defended even by uncontradicted evidence that the licensee took all reasonable steps to ensure compliance with Chapter 6.54.

Our holding on this issue is supported by another recent Sixth Circuit Opinion

**5.** Despite the fact that this language is contained within the provision regarding a violation for failure to maintain the premises in "a sanitary or safe condition," the language of Metro Code Section 6.54.1(B)(1) makes clear that the above defenses apply to any "violation of Chapter 6.54," including the violation at issue in this case.

concerning the very ordinances at issue in this case. In *Deja Vu of Nashville, Inc. v. Metropolitan Government of Nashville*, 274 F.3d 377 (6th Cir.2001), the Sixth Circuit was faced with the similar question regarding the "no touch/buffer zone provision" on the ground that a violation of such provision did not contain a mens rea requirement. *Id.* at 397. The Court concluded that neither the "no touch/buffer zone provision," nor the provision imposing vicarious liability on licensees was unconstitutional. With regard to the constitutionality of the vicarious liability provision of Metro Code Chapter 6.54, the Court stated:

> Moreover, the Ordinance does not allow for strict liability, even for licensees. Section 6.54.150(B)(1) states that a club will be fined or have its license suspended (or both) for violating any of the Ordinance's provisions. However, Subsection (B)(1) also affords licensees the affirmative defense that management was "powerless to prevent" the violation. Accordingly, liability for violating the no-touch/buffer zone provision is limited to those instances where a licensee could have, but failed to prevent the proscribed conduct. The provision, thus interpreted, is constitutional.

*Deja Vu*, 274 F.3d at 398. We agree with the Sixth Circuit's interpretation of the vicarious liability provision of Metro Code Chapter 6.54. *See Leggett v. Duke Energy Corp.*, 308 S.W.3d 843, 871 (Tenn.2010) (citing *United States ex rel. Lawrence v. Woods*, 432 F.2d 1072, 1075–76 (7th Cir. 1970)) (noting that the decisions of lower federal courts may be considered persuasive authority in Tennessee State courts). Unlike in *Lee*, the ordinances here clearly indicate that the licensee's knowledge that specified sexual activities are taking place in prohibited parts of the Club and/or powerlessness to prevent the violation are relevant inquiries and appropriate defenses to liability. Accordingly, we conclude that the vicarious liability provision of Metro Code Chapter 6.54 is constitutionally sound.

Finally, we also respectfully disagree with the Club's assertion that the Club's evidence regarding its efforts to ensure compliance with Metro Code Chapter 6.54 "was not meaningfully considered" by the Metro Licensing Board. The administrative record includes the deliberations of the Metro Licensing Board with regard to its finding of liability on the part of the Club. During the deliberations, the following exchange between Metro Licensing Board Members Worrick Robinson and Johnny Crumby took place:

> Mr. Robinson: With regard to [the Club], for me, looking at the definitions and looking at the ordinances, I really didn't hear from the floor manager what I really wanted to hear, and Mr. Herbison corrected that to some degree, about whose responsibility it is and whose fault it is, but I think he was there immediately before that. That's his job, he understands his job. I think that they have a responsibility by law but I didn't hear any testimony that he, the floor manager, clearly saw it and couldn't have missed it. And while I think there's an affirmative duty, he indicated he felt there was an affirmative duty, the owner stated that there was an affirmative duty to educate and control the premises, I am not sure that we can hold the club responsible for overt actions of individual dancers who break the rules, break the ordinances. It's his job to police it but I'm not sure that's exactly what we have here in this particular instance, based on the testimony I heard.

> Mr. Crumby: Well, I'll be on the opposite side this time. I think it was his responsibility. Now if he was in the

room where he should have been, making sure the girl was protected, number one, that's one of his main jobs, and not going to see how long they had, _he should have had a stopwatch in his pocket. He should have had a watch on and been able to say you went in there at a quarter after and it's been 17 minutes. He didn't have to leave the room. And, you know, I think it was his fault and I think the club is responsible for what goes on on the premises. The girls will only get by with what the club will let them get by with. If she was doing that, it was somebody—you know, it's not her first time. You just don't, all of a sudden, jump into a position where you're in violation of the law. She should have been on the stage. She shouldn't have even been close to the patron enough so that they could even touch. So I do feel that they are in violation and they should be held responsible. You know, last time five days apparently didn't get the attention. So I was ready to go to the max on this because, you know, what's going to happen next? So that's where I fall on the line is, you know, I'm looking at between 30 and 90. I can go 60, I can go 45, but I think they are responsible for what takes place on their property.

After this testimony, the Metro Licensing Board voted three in favor, one opposed, to finding the Club in violation of Metro Code Section 6.54.140(C). Clearly, Metro Licensing Board Members Robinson and Crumby differed as to their view of the evidence; however, there can be no dispute that evidence concerning the Club's efforts to ensure compliance with Chapter 6.54 was considered by the Metro Licensing Board in order to determine whether it served as mitigation or a full defense to the claim of vicarious liability charged against the Club. Accordingly, the Club's

contention that this evidence "was not meaningfully considered" is without merit.

■ We conclude that the Metro Licensing Board did not err in finding the Club vicariously liable for the violation of the entertainer in this case. As previously discussed, the finding against the entertainer was supported by material evidence. The Club does not appear to argue that the Metro Licensing Board erred in finding material evidence to hold the Club vicariously liable for the entertainer's violation, despite the evidence regarding the Club's efforts to comply with Chapter 6.54. Indeed, we conclude that material evidence in the record exists to support the finding of vicarious liability. Specifically, the record shows that a compliance inspector walked into the VIP Room to observe the improper contact already in progress, despite the fact that the floor manager testified that he was close by and that it was his duty to prevent such contact. Under these circumstances, there is material evidence to show that the floor manager, as the person in charge of ensuring the Club's compliance with Chapter 6.54, should have known of the inappropriate contact and was not powerless to prevent it. Accordingly, the finding that the Club was vicariously liable for a violation of Metro Code Section 6.54.140(C) is affirmed.

### Excessive Penalty

■ The Club next argues that the Metro Licensing Board imposed an excessive penalty when it suspended the Club's license for a period of thirty-one days. Specifically, the Club argues that the Metro Licensing Board ordered suspension

> all because a dancer pulled down her tube top a scant few inches, for up to perhaps four minutes, in an unauthorized part of an enclosed building to which only adults (who pay a cover

charge for the privilege) are admitted, in the presence of a solitary customer. What a difference the strategic location of a few square inches of fabric makes!

■■■ A civil forfeiture violates the Eighth Amendment's excessive fines prohibition "if it is grossly disproportional to the gravity of a defendant's offense." *United States v. Bajakajian,* 524 U.S. 321, 335, 118 S.Ct. 2028, 2037, 141 L.Ed.2d 314 (1998). The Tennessee Supreme Court held in 1998 that civil forfeitures implicate the excessive fines clause of both the Tennessee and United States Constitutions:

> Article I, § 16 of the Tennessee Constitution and the Eighth Amendment to the United States Constitution both provide that excessive bail "shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." This Court has previously construed the cruel and unusual punishment clause of Article I, § 16 to be coextensive with its federal counterpart. *State v. Harris,* 844 S.W.2d 601, 603 (Tenn.1992); *State v. Black,* 815 S.W.2d 166, 188–89 (Tenn.1991). Accordingly, we will construe the excessive fines clause of Article I, § 16 in the same manner.

While forfeiture is not necessarily a criminal action for purposes of the double jeopardy clause, forfeiture is, at least in part, a punitive measure. As a result, the excessive fines clause applies even to civil *in rem* forfeitures of property. *Austin v. United States,* 509 U.S. 602, 621–22, 113 S.Ct. 2801, 2812, 125 L.Ed.2d 488, 505–06 (1993).

*Stuart v. State Dep't of Safety,* 963 S.W.2d 28, 34 (Tenn.1998). The Tennessee Supreme Court further held that "any analysis under the excessive fines clause must include a proportionality test." *Id.* at 35. Thus, the Club argues that the penalty of a thirty-one day suspension is not propor-

tional to the violation because there was no testimony regarding any actual harm caused by the violation. In contrast, the Club argues that the uncontradicted testimony of Ms. Howell establishes that a thirty-one day suspension will have devastating financial effects for the Club and Ms. Howell, and as a result, the Club may be unable to reopen.

The Metro Licensing Board does not argue that the penalty imposed in this case is not subject to the strictures imposed by the Excessive Fines Clause. Instead, the Metro Licensing Board argues that:

> Respectfully, [the Club] is attempting to trivialize the concerns of the Metro Council in passing the ordinance. The Council viewed multiple violations of such as those prohibited by subsection 6.54.140(C) as abhorrent and deserving of penalty of up to ninety (90) days. Moreover, the Council's concern with the inherent harm threatened by such behavior is in accord with that of the state Legislature as evidenced by the state public indecency law, in which nudity includes the showing of the female breast with less than a fully opaque covering of the areola in a public place. Tenn.Code Ann. § 39–13–517.

■■■ We note, however, that with regard to a penalty imposed by an agency, our review is limited to whether the remedy is "'unwarranted in law' or 'without justification in fact.'" *Robertson v. Tenn. Bd. of Soc. Worker Certification,* 227 S.W.3d 7, 14 (Tenn.2007) (quoting *Mosley v. Tenn. Dep't of Commerce & Ins.,* 167 S.W.3d 308, 321 (Tenn.Ct.App.2004)). Further, the "[c]ourts are not to substitute their judgment as to an appropriate sanction for that of the agency responsible for enforcement," as "'[t]he appropriate remedy is particularly within the discretion of the [agency].'" *City Towing & Transp., Inc. v. Transp. Licensing Comm'n of the*

*Metro. Gov't of Nashville,* No. M2007–01246–COA–R3–CV, 2009 WL 276761, at *4 (Tenn.Ct.App. Feb. 3, 2009) (quoting *Robertson,* 227 S.W.3d at 13). Thus, "[s]o long as the sanctions imposed by an agency are within the scope of its statutory authority, the reviewing court should not substitute its judgment for that of the agency, unless the penalty is so clearly disproportionate to the offense and completely inequitable in light of the surrounding circumstances as to be shocking to the conscience of the Court." *Overton v. Bd. of Exam'rs in Psychology,* No. 01–A–01–9603–CH–00098, 1996 WL 656104, at *2 (Tenn.Ct.App.1996) (quoting 73A Corpus Juris Secondum, *Public Administrative Law and Procedure* § 223 (1983)).

We agree with the Metro Licensing Board that the penalty in this case is not so grossly disproportionate as to offend the excessive fines clause of the Tennessee and United States Constitutions. Here, the penalty imposed was not the result of a single *de minimis* violation of the Metro Code. Indeed, rather than merely involving the placement of fabric, the penalty was issued to the Club on the basis that the entertainer both exposed specified anatomical areas, and had physical contact with a customer in a way arguably involving specified sexual activities, in direct violation of Metro Code Chapter 6.54.

The United States Court of Appeals for the Sixth Circuit has also indicated that Metro Nashville has a "substantial government interest" in regulating this type of conduct, and specifically has an interest in the "no touch/buffer zone provision" violated in this case. *See Deja Vu,* 274 F.3d at 392, 396. According to the Court:

Metropolitan Nashville properly passed this portion of the Ordinance pursuant to its police power; it intended this provision to redress the high instances of sex crimes prevalent at sexually oriented

businesses and to deter the spread of disease; and requiring dancers to perform on stages removed three feet from any customer poses only an incidental burden on their right to erotic speech that is no greater than is essential to further Metropolitan Nashville's substantial interests. *See DLS, Inc. v. City of Chattanooga,* 107 F.3d 403, 412–13 (6th Cir.1997) (upholding six-foot buffer zone to more effectively enforce ban on contact between erotic dancers and audience members and to prevent occurrence of activities likely to result in criminal behavior or to prevent risk of disease).

*Deja Vu,* 274 F.3d at 396 (applying the four-part test in *United States v. O'Brien,* 391 U.S. 367, 377, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968), which includes a requirement that "the Ordinance must further a substantial governmental interest").

Because Metro Nashville has a substantial interest in regulating this conduct, a violation of the provisions regulating this conduct is serious, regardless of any monetary harm caused to Metro Nashville. Indeed, the Tennessee General Assembly has concluded that the absence of "of a few square inches of fabric" in the same "strategic location[s]" can result in a charge of criminal public indecency when the exposure occurs in public. *See* Tenn.Code Ann. § 39–13–517 (making it a crime to knowingly "[a]ppear[ ] in a state of nudity," defined as "the showing of the female breast with less than a fully opaque covering of the areola"). Nothing in the criminal public indecency statute requires monetary harm to the State for that statute to be enforced. Moreover, this case represents the second such violation by the Club in less than two years. While the Club testified that they had measures in place to ensure compliance with the Metro Code, it was undisputed that the floor manager left his post at the time in question and did not otherwise prevent the violation at is-

sue. Additionally, the Metro Licensing Board had the statutory authority to impose a suspension of up to ninety days. Instead, the Metro Licensing Board chose to impose the most lenient penalty allowed by Metro Code Chapter 6.54. Under these circumstances, we cannot conclude that the penalty imposed was grossly disproportionate to the conduct involved in the violation.

### Conclusion

The judgment of the Chancery Court of Davidson County is affirmed and this cause is remanded to the trial court for all further proceedings as are necessary and are consistent with this Opinion. Costs of this appeal are taxed to Appellant, Gabrielle Howell, d/b/a Gabrielle's VIP Club, and her surety.